150 P.3d 144 (2007)
STATE of Washington, Appellant,
v.
Gregory WILSON, Jr., Respondent.
No. 34277-4-II.
Court of Appeals of Washington, Division 2.
January 9, 2007.
*146 Carol L. Case, Clallam County Prosecutor's Office, Port Angeles, WA, for Appellant.
Manek R. Mistry, Jodi R. Backlund, Backlund & Mistry, Olympia, WA, for Respondent.
HUNT, J.
¶ 1 The State appeals the trial court's dismissal of Gregory Wilson's first degree burglary jury conviction and its same criminal-conduct finding in calculating Wilson's offender score for his assault in violation of a protection order and felony harassment convictions. We affirm the trial court's dismissal of the burglary conviction, reverse the trial court's finding that the assault and the harassment constituted the same criminal conduct for offender score purposes, and remand for resentencing.

FACTS

I. CRIMES
¶ 2 On April 16, 2005, the Clallam County District Court issued a no-contact order prohibiting Gregory Wilson from contacting Charlene Sanders, his girlfriend of six years, in person, by telephone, or through any intermediary except an attorney, a police officer, or an officer of the court. The no-contact order listed Sanders' address as 1123 East Park Avenue in Port Angeles, but it did not prohibit Wilson's presence at that address, where he and Sanders had been living together.
¶ 3 Shortly thereafter, Sanders and Wilson co-signed a lease for the 1123 East Park residence and resumed living together. Their automobiles and all Wilson's clothing remained at this residence. Wilson had keys to the residence, to which Sanders referred as "[o]ur house."
¶ 4 On August 22, 2005, Wilson and Sanders argued, and Wilson left the house angry around 11:00 P.M. Sanders "knew he'd be back." Wilson returned home around 2:30 A.M. Unable to open the door without his key, which he had left behind, Wilson angrily forced open the kitchen door, splintering some of the wood, went to the bedroom, grabbed Sanders by her hair, and pulled her out of bed. Sanders asked Wilson to go into the kitchen with her so they would not wake her sleeping grandson.
¶ 5 At some point, Wilson kicked Sanders once, left the house to speak with friends outside, immediately returned and re-entered the house, picked up a piece of the splintered wood from the kitchen door, and used it to threaten to kill Sanders.
¶ 6 Using her cellular phone to call 911, Sanders told the police that Wilson was living at the home, but "he wasn't supposed to be there." Wilson left the home and traveled by car to a friend's house. When the police arrived at the residence, Sanders refused medical attention because she "hadn't been hurt in any way."
¶ 7 Later that evening, the police arrested Wilson at his friend's house and took him to the police station to be interviewed. Wilson *147 voluntarily admitted that he was aware of the no-contact order, but said that he had moved in because he was "trying to do the right things [sic] to assist Sanders in taking care of her kids, providing for them and such." Report of Proceedings (RP) (Nov. 1, 2005) at 120.

II. PROCEDURE
¶ 8 The State charged Wilson with first degree burglary, assault in violation of a protection order, and felony harassment.

A. TRIAL
¶ 9 At Wilson's jury trial, the State presented the following evidence: (1) photographs of the kitchen door that Wilson broke when he entered the house; (2) the 911 tape, which included Sanders' panic-stricken plea for the police come to the house because Wilson was assaulting and threatening her; and (3) the testimonies of the arresting officers and Sanders, who testified somewhat reluctantly.[1] Wilson presented no defense case.
¶ 10 After both sides rested, Wilson moved to dismiss the burglary charge. He argued that all the evidence established that he lived in the home with Sanders and, thus, he could not have entered unlawfully. The State countered that the no-contact order made Wilson's presence unlawful regardless of the parties' rental agreement or Sanders' consent to Wilson's presence in the home. Expressing its skepticism of the burglary charge's validity, the trial court denied the motion and allowed it to go the jury with the other two counts. The jury convicted Wilson of all three charges.
¶ 11 After the jury returned its verdict, the trial court noted that the critical question under the burglary statute is whether the defendant is licensed or privileged to be in the home at the time of the allegedly unlawful entry, and it dismissed the burglary conviction, for the following reasons: (1) the no-contact order did not prohibit Wilson's presence in this house; (2) Sanders had authorized Wilson to be in the home, he had keys to the home, and he had been living there for several months; (3) Sanders had never revoked Wilson's right to be in the house; and (4) Sanders told 911 dispatch that Wilson lived at the residence even at the time of her call for help. The trial court also expressed concern that, if it adopted the State's reasoning, Wilson would have committed a burglary every day for four months before his arrest, each time he entered the residence with intent to have contact with Wilson.

B. Sentencing
¶ 12 At sentencing, the State argued that Wilson's offender score should be one because the events underlying the remaining two jury convictions occurred sequentially rather than simultaneously and, thus, there was a different mens rea for each action. Wilson argued that his offender score should be zero because the assault and the harassment comprised the same criminal conduct.
¶ 13 The trial court agreed with Wilson, reasoning that (1) when Wilson came into the house at 2:30 A.M., his intent was to assault and to harass Sanders; (2) these two charges included the same victim and the same intent, and they occurred simultaneously; and (3) therefore, the assault and the harassment should count as the same criminal conduct in calculating Wilson's offender score. Treating the two counts as the same criminal conduct and calculating Wilson's offender score as zero, the trial court sentenced Wilson to 11 months confinement for the assault, with credit for time served, and 90 days for the harassment, to be served concurrently.
¶ 14 The State appeals.

ANALYSIS

I. DISMISSAL OF BURGLARY CONVICTION
¶ 15 It is undisputed that (1) Wilson entered the residence he shared with Sanders, (2) intending to assault and to harass Sanders inside, and (3) his contact with her violated a no-contact order. The State argues that, because Wilson entered and remained *148 with intent to commit a crime, namely to contact Sanders in violation of the no-contact order, the trial court erroneously dismissed Wilson's burglary conviction. Thus, we address a legal issue of first impression whether entry or remaining in a jointly shared residence, from which neither party has been lawfully excluded, is unlawful for purposes of establishing this essential element of the crime of burglary.[2]
¶ 26 We agree with the trial court and hold that, although the acts Wilson committed inside the residence were unlawful, his acts of entering and remaining inside were not themselves unlawful because the no-contact order did not exclude him from the residence he shared with Sanders.

A. Standard of Review
¶ 17 Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Salinas, 119 Wash.2d at 201, 829 P.2d 1068. Circumstantial evidence and direct evidence are equally reliable. State v. Delmarter, 94 Wash.2d 634, 638, 618 P.2d 99 (1980).
¶ 18 Credibility determinations are for the trier of fact and are not subject to appellate review. State v. Camarillo, 115 Wash.2d 60, 71, 794 P.2d 850 (1990). We must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Walton, 64 Wash.App. 410, 415-16, 824 P.2d 533, review denied, 119 Wash.2d. 1011, 833 P.2d 386 (1992).

B. First Degree Burglary
¶ 19 We reiterate the following uncontroverted facts that the trial court found significant: (1) The no-contact order did not prohibit Wilson from entering or remaining at the 1123 East Park residence; (2) the no-contact order left unchecked the adjacent box and blanks in the form that read: "() remain ____ feet from the above-listed person(s) residence(s), workplace(s) ____, school/daycare_____"; and (3) in contrast, there were check marks in four other adjacent boxes prohibiting various forms of personal contact with Sanders. Exhibit 1. Thus, the no-contact order language prohibited Wilson only from being in contact with Sanders; it did not prohibit him from entering or getting near any specific location, including the East Park residence. Moreover, in spite of the State's argument to the contrary, it is also uncontroverted that, at the time of the incident, Wilson was living at the 1123 East Park residence with Sanders' permission. Not only does the record support this fact, but also the State failed to assign error to the trial court's finding of fact that:
Despite the No-Contact order of April 16, 2005, Ms. Sanders and Mr. Wilson had co-habited at the Park Avenue address continually since said order and were so co-habiting on the date of the alleged Burglary. Both she and Mr. Wilson had signed the lease agreement for that residence when they moved in and they had resided there essentially continually since. Mr. Wilson kept all his clothes and personal belongings there and considered it his home. Handwritten note: He also had keys to the residence.
Clerk's Papers (CP) at 21, Findings of Fact and Conclusions of Law No. 3. C. Thus, we treat this finding as a verity on appeal. See Baugh v. Dunstan & Dunstan, 67 Wash.2d 710, 712, 409 P.2d 658 (1966).
¶ 20 The issue, then, is whether under the circumstances of this case, Wilson could be guilty of burglary within the meaning of RCW 9A.52.020 and RCW 9A.52.010(3).

1. Elements
A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, *149 the actor or another participant in the crime . . . assaults any person.
RCW 9A.52.020(1)(b). A person unlawfully enters a building when he is not then licensed, invited, or otherwise privileged to enter or remain. RCW 9A.52.010(3).
¶ 21 For purposes of this opinion, we assume that Wilson entered the residence with intent to commit a crime, namely contacting, assaulting, and harassing Sanders in violation of the no-contact order, a misdemeanor under RCW 26.50.110(1). Accordingly, we focus on whether the record supports a separate burglary element, namely "unlawfully entering or remaining" in a building. We find instructive the common law, a previous decision from our court, and an Ohio case addressing a similar issue.
¶ 22 At common law, courts viewed burglary as an offense against habitation and occupancy. State v. Klein, 195 Wash. 338, 342, 80 P.2d 825 (1938). Thus, a court could not convict a defendant of burglary for entering his own home with felonious intent. This rule applied to joint occupants as well as to sole owners of homes. See Clarke v. Commonwealth, 66 Va. 908, 916-17 (1874) (the important factor has been occupancy, rather than ownership, of the home); People v. Gauze, 15 Cal.3d 709, 125 Cal.Rptr. 773, 542 P.2d 1365 (1975).
¶ 23 Similarly, modern burglary statutes remain an offense "against the security of habitation or occupancy, rather than against ownership or property." 3 CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW § 316 (15th edition 1995) (footnote omitted); see also Klein, 195 Wash. at 342, 80 P.2d 825 (the test of ownership in Washington is not legal title, but rather occupancy and possession at the time of the offense.). Thus, in determining whether an offender's presence is unlawful, courts must turn to whether the perpetrator maintained a licensed or privileged occupancy of the premises.

2. Domestic violence context
¶ 24 In domestic violence cases, determining possession of a residence presents a murky area of law. Although Washington case law is clear that an offender can burglarize the residence of his or her spouse or partner despite legal ownership of the property,[3] these cases generally apply to situations where the couples are estranged and living separately. See e.g., State v. Stinton, 121 Wash.App. 569, 574, 89 P.3d 717 (2004); State v. Schneider, 36 Wash.App. 237, 241, 673 P.2d 200 (1983) (holding that wife was an accomplice to burglary when she arranged for two teenagers to enter her estranged husband's residence to commit a crime). We have not found any Washington cases, however, addressing the issue herewhether an offender can burglarize his own residence that he co-possesses and co-habits with his spouse or partner.

a. Lawfulness of entry and remaining
¶ 25 We must decide here whether the record supports the trial court's finding that Wilson and Sanders remained joint occupants of the residence at 1123 East Park and, if so, whether Wilson's entry itself was lawful, regardless of what he intended to do once inside.
¶ 26 The testimony at trial demonstrated that (1) before Wilson and Sanders co-signed the lease for the residence at 1123 East Park, Sanders allowed Wilson to live there; (2) Wilson had keys to the residence; (3) all of Wilson's clothing as well as his automobiles remained at this residence up to and after the incident at issue here; (4) the State presented no evidence that Wilson had a separate primary residence; and (5) even at trial, Sanders referred to the residence as "[o]ur house." Thus, it is uncontroverted that Sanders gave Wilson permission to reside at 1123 East Park and that he continued to live there with her consent at the time of the assault.
¶ 27 The State argues, however, that the no-contact order made Wilson's presence inside the residence unlawful, regardless of Sanders' consent and Wilson's other claims on this residence. As the State correctly *150 points out, Sanders could not waive the court's no-contact order.[4] The State then argues that, therefore, Sanders could not consent to Wilson's presence in their home.[5] That Sanders could not override the no-contact order by allowing Wilson to be in contact with her, whether inside the residence or elsewhere, does not thereby make his entry into the residence unlawful for purposes of the burglary statute.
¶ 28 At oral argument, the State acknowledged that Wilson's entry into the residence he shared with Sanders would not have been unlawful within the meaning of the burglary statute (1) if Sanders had not been home at the time, or (2) if she had been at home in a separate room that Wilson did not enter. The State also conceded that if Sanders had been at the residence of a friend who had also invited Wilson, Wilson's act of entry into the friend's house, even with the same purpose to assault Sanders as here, would not transform that entry into a burglary because he would have entered with the friend's consent.
¶ 29 As we note above, the purpose of a burglary statute is to protect the occupancy and habitation of a residence. Here, with Sanders' assent, Wilson was a co-occupant and co-lessee of the residence, from which the no-contact order had not excluded him. Although the purpose of a no-contact order is to prevent a victim from having to face her batterer, the burglary statute's intent is to allow an occupant to prevent all those who are unwelcome from entering the premises. It is the consent, or lack of consent, of the residence possessor, not the State's or court's consent or lack of consent, that drives the burglary statute's definition of a person who "is not then licensed, invited, or otherwise privileged to so enter or remain" in a building. RCW 9A.52.010(3). See, e.g. Iowa v. Hagedorn, 679 N.W.2d 666, 670-71 (2004). Here, Sanders and Wilson, not the State, occupied the 1123 East Park residence.

b. Case lawStinton
¶ 30 In Stinton, a no-contact order prevented the defendant from harassing contact with the mother of their children with whom he previously resided. The order expressly barred him from their former joint residence. 121 Wash.App. at 571, 89 P.3d 717. Thus, at the time of the incident, Stinton and the victim were living in separate residences. When Stinton went to the victim's residence, she let him in. But when he began taking some of her personal property, they engaged in a heated exchange and she asked him to leave. Stinton left, but he immediately returned, kicking in the door and resuming arguing with the victim. 121 Wash.App. at 571, 89 P.3d 717. When she called 911, Stinton twice said to her, "Thanks a lot . . . this is a felony." Id.
¶ 31 The State charged Stinton with burglary, on the theory that (1) his intended contact and harassment was a crime, in violation of the no-contact order; and (2) the crime he intended to commit when he unlawfully entered the victim's home was in violation of a separate provision of the no-contact order specifically excluding him from their former joint residence. The trial court dismissed the burglary charge because the facts did not establish prima facie proof of all the elements of the crime. The State appealed, and we reversed.
¶ 32 Unlike the situation here, it was undisputed that Stinton "entered or remained unlawfully in [their former] residence." Id. at *151 575, 89 P.3d 717. Morever, Stinton even conceded that his entry was unlawful. Id. at 576, 89 P.3d 171. We reasoned that Stinton committed burglary when he unlawfully entered the residence without permission and with the intent to commit the crime of harassing the victim in violation of the court order expressly excluding him from her residence.[6] Id. at 575, 89 P.3d 717. We held that "the violation of a provision of a protection order can serve as the predicate crime for residential burglary." Id. at 571, 89 P.3d 717.
¶ 33 In rejecting Stinton's argument that "the State's theory would improperly "elevate all violation of protection orders to burglaries," we noted:

The court may specifically tailor a protection order to the petitioner's circumstances by including multiple provisions forbidding the respondent from a variety of misconduct toward the petitioner. RCW 26.50.060; [Spence. v.] Kaminski, 103 Wash.App. 325] 331, [12 P.3d 1030 (2000)]. Thus, the respondent may violate a protection order by disobeying one or several of multiple provisions. See RCW 26.50.110(1) ("a violation of the restraint provisions, or of a provision excluding the person from a residence, workplace, school, or day care, or of a provision prohibiting a person from knowingly coming within, or knowingly remaining within, a specified distance of a location") (emphasis added).

Stinton's protection order contained two provisions prohibiting separate and distinct conduct toward McNeill. And the evidence of Stinton's harassing and threatening McNeill was separate and distinct from the evidence supporting his unlawful entry.

Stinton, 121 Wash.App. at 575, 89 P.3d 717 (first and last emphasis added).
¶ 34 Here, in contrast, the court that issued the no-contact order did not specifically tailor the order to exclude Wilson from Sanders' residence or workplace. And, although it could easily have excluded Wilson from the residence simply by checking the box on the form and filling in the prohibited addresses, it did not do so. Thus, the no-contact order provision prohibiting Wilson's contact with Sanders criminalized only personal contact between them; but it did not thereby criminalize, or transform into a burglary, Wilson's entry into his own home, even though he entered with criminal intent to assault and to harass Sanders.
¶ 35 Our Legislature has promulgated special statutes prohibiting and criminalizing assaultive conduct (see RCW 9A.36.021), violation of a no-contact order (RCW 9A.46.080), and assault in violation of a no-contact order (RCW 26.50.110). But in so doing, the Legislature did not also include in its statutory definition of burglary a person's entry into his own home, from which he had not been lawfully excluded, regardless of what crime he may intend to commit once inside.[7]
*152 ¶ 36 Although, as we said in Stinton, "residential burglary can be a crime of domestic violence," 121 Wash.App. at 577, 89 P.3d 717, the crime of domestic violence that Wilson committed here was not burglary. Unlike in Stinton, here, the State did not present evidence of all legislatively required elements of burglary, namely unlawful entry or remaining in the residence. RCW 9A.52.020(1)(b); RCW 9A.52.010(3).

c. Revocation of consent
¶ 37 The State further argues that when Sanders dialed 911, she implicitly revoked any permission she may have given Wilson to be in the residence. But the cases the State cite involve a home owned, possessed, or controlled by the victim, who, therefore, could unilaterally revoke consent for the abuser to remain present.
¶ 38 But here, as we note above, it is uncontroverted that Sanders did not have exclusive control over the home. On the contrary, it was Wilson's home, too. And although it was clearly criminal for him to assault her anywhere, his act in entering or remaining in his own home was not itself a criminal act. Thus, we reject the State's argument that once Sanders called the police, Wilson remained unlawfully for the purposes of the burglary statute.
¶ 39 Based on the facts on the record before us, we hold as a matter of law that Wilson could not have burglarized the 1123 East Park resident by entering and remaining unlawfully because it was his residence and neither a court order nor Sanders had lawfully excluded him from it. Thus, unlike in Stinton, here we affirm the trial court's dismissal of the burglary charge and conviction.

II. OFFENDER SCORESAME CRIMINAL CONDUCT
¶ 40 The State next argues that the trial court erred in finding that Wilson's assault and harassment of Sanders constituted the same criminal conduct. We agree.

A. Standard of Review
¶ 41 RCW 9.94A.589(1)(a) defines "same criminal conduct" as "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." All three factors must be present. State v. Porter, 133 Wash.2d 177, 181, 942 P.2d 974 (1997), cited in State v. Price, 103 Wash.App. 845, 14 P.3d 841 (2000), review denied, 143 Wash.2d 1014, 22 P.3d 803 (2001).
If any one element is missing, multiple offenses cannot be said to encompass the same criminal conduct, and they must be counted separately in calculating the offender score. See Note, The "Same Criminal Conduct" Exception of the Washington Sentencing Reform Act: Making the Punishment Fit the CrimesState v. Collicott, 112 Wash.2d 399, 771 P.2d 1137 (1989), 65 WASH. L.REV. 397, 402-03 (1990). State v. Lessley, 118 Wash.2d 773, 778, 827 P.2d 996 (1992).
¶ 42 We construe RCW 9.94A.589(1)(a) narrowly to disallow most assertions of "same criminal conduct." State v. Flake, 76 Wash.App. 174, 180, 883 P.2d 341 (1994). Nonetheless, we will reverse a sentencing court's determination of same criminal conduct only when there is a "clear abuse of discretion or misapplication of the law." State v. Elliott, 114 Wash.2d 6, 17, 785 P.2d 440, cert. denied, 498 U.S. 838, 111 S.Ct. 110, 112 L.Ed.2d 80 (1990).
¶ 43 To decide whether two crimes involve the same criminal intent for purposes of determining "same criminal conduct," the court must examine and compare each statute underlying each crime to determine whether the required intents are the same or different for each crime. State v. Hernandez, 95 Wash.App. 480, 484, 976 P.2d 165 (1999). Two crimes do not contain the same criminal intent when the defendant's intent objectively changes from one crime to the other. State v. King, 113 Wash.App. 243, 295, 54 P.3d 1218 (2002), review denied, 149 Wash.2d 1315, 69 P.3d 874 (2003). Objective *153 intent may be determined by examining whether one crime furthered the other or whether both crimes were a part of a recognizable scheme or plan. State v. Lewis, 115 Wash.2d 294, 302, 797 P.2d 1141 (1990). But where the second crime is "accompanied by a new objective `intent,'" one crime can be said to have been completed before commencement of the second; therefore, the two crimes involved different criminal intents and they do not constitute the same criminal conduct. State v. Grantham, 84 Wash.App. 854, 859, 932 P.2d 657 (1997).[8]

B. Criminal Intent

1. Trial Court Finding
¶ 44 At sentencing, the trial court evaluated Wilson's assault and harassment of Sanders. It ruled that (1) Wilson's conduct clearly involved the same victim, Sanders, at the same time and place; (2) thus, the only relevant inquiry was whether Wilson's criminal intent changed at any time during the episode such that it was not the "same" for both convictions; (3) Wilson entered the residence at 2:30 A.M. with intent to assault and harass Sanders; (4) Wilson's brief foray into the front yard did not change his original intent to harass and to assault Sanders; and (5) the two crimes also involved the same intent. It is uncontroverted that Wilson's assault and harassment of Sanders occurred at the same place, against the same victim, and within a relatively short, though not exactly the same, time span. We disagree, however, with the trial court's apparent finding of same criminal intent.

2. Separate criminal intents
¶ 45 The State argues, and we agree, that the record shows (1) Wilson entered the home with the intent to assault Sandershe broke down the door, went immediately to the bedroom, pulled Sanders out of bed by her hair, and kicked her in the stomach; (2) when Sanders said that she was going to call the police, Wilson left the house to warn his friends outside; and (3) Wilson then reentered the house, this time with a newly formed and separate intent to harass Sanders verballyhe lifted a stick of wood from the broken door and threatened to kill Sanders.
¶ 46 The criminal intent for harassment requires that the defendant knowingly threaten (1) to cause bodily injury to another; (2) to cause physical damage to the property of another; (3) to subject another to physical confinement or restraint; or (4) maliciously to perform any act that places the person threatened in fear for her physical or emotional safety. RCW 9A.46.020. Assault in violation of a no-contact order requires that the defendant intentionally assault another (assault not amounting first or second degree) when a court has already issued a protective order restricting contact between the parties. RCW 26.50.110(4).
¶ 47 The record clearly shows that Wilson had separate criminal intents for the two actsone for the assault (physically assaulted Sanders when he pulled her by the hair from the bed) and one for the harassment (threatened to kill Sanders while waving a stick of wood at her). Not only do these two crimes' respective statutes define different criminal intents, but also the two acts giving rise to the two criminal charges were separated in time, providing opportunity for completion of the assault and ending Wilson's assaultive intent, followed by a period of reflection and formation of a new, objective intent upon reentering the house to threaten Sanders and to harass her. Grantham, 84 Wash.App. at 858, 932 P.2d 657. Construing RCW 9.94A.589(1)(a) narrowly, as we must, to disallow most assertions of "same criminal conduct," we vacate the trial court's same criminal-conduct finding. Flake, 76 Wash.App. at 180, 883 P.2d 341.
*154 ¶ 48 Accordingly, we affirm the trial court's dismissal of the burglary conviction, reverse the trial court's finding that the assault and harassment constituted the same criminal conduct for offender score purposes, and remand for resentencing.
We concur: HOUGHTON, C.J., and VAN DEREN, J.
NOTES
[1] Sanders testified that the prosecutor "threatened" her with jail time to obtain her appearance.
[2] RCW 9A.52.020(1)(b).
[3] The Model Penal Code warns that the "unlawful remaining" section of many burglary statutes creates a risk that the State will severely punish an offender under a burglary charge for an otherwise minor offense. MODEL PENAL CODE § 221.1, commentary at 71.
[4] State v. Dejarlais, 88 Wash.App. 297, 299, 944 P.2d 1110 (1997), affirmed, 136 Wash.2d 939, 969 P.2d 90 (1998).
[5] The State relies primarily on our decision in State v. Jacobs, 101 Wash.App. 80, 2 P.3d 974 (2000). We dismissed Jacobs' Fourth Amendment suppression claim when the police found him at a residence, the owner of which a court had prohibited him from contacting. 101 Wash.App. at 83-84. We reasoned that Jacobs' presence at the residence was unlawful and, therefore, he had no privacy interest in the residence even though the no-contact order did not explicitly bar him from the residence. 101 Wash.App. at 87-88, 2 P.3d 974.

Jacobs, however, is distinguishable from the case here because, unlike Wilson, Jacobs did not live at the residence where he contacted the subject of the no-contact order: Instead, he lived separately with friends or in a park. 101 Wash. App. at 86-88, 2 P.3d 974. Therefore, we reasoned that, in addition to the no-contact order, Jacobs had no expectation of privacy at the residence because he did not live there.
[6] See also State v. O'Neal, 103 Ohio App.3d 151, 658 N.E.2d 1102, 1104 (1995), in which the Ohio Court of Appeals noted that in all jurisdictions (including Washington, citing Schneider), criminalizing one spouse's burglarizing the other, the common thread was clear evidence that the spouses had taken up separate residences. 658 N.E.2d at 1104. Thus, the Ohio court reasoned that, in the absence of a restraining order preventing a spouse from the residence, the court's primary inquiry must be whether the evidence demonstrates that possessory interest in what had been the parties' common property had passed from both partners to one single occupant. 658 N.E.2d at 1104.

Similarly, courts in other jurisdictions have focused on the parties' separate residences when addressing the propriety of burglary convictions after a court has issued a no-contact order against a spouse or domestic partner who formerly lived in the burglarized home. See People v. Johnson, 906 P.2d 122, 125 (Colo.1995) (majority of states "have found that the uninvited entry of an estranged spouse into the residence of the other spouse constitutes an `unlawful entry' "); Parham v. State, 79 Md.App. 152, 556 A.2d 280, 285 (1989) (affirming burglary when victim had thrown defendant out three weeks before the crime and defendant lived in a separate residence); Hagedorn, 679 N.W.2d at 671-72 (upholding burglary conviction where wife had repeatedly told defendant to stay away from their co-owned house, wife was living with another man, and defendant entered house without wife's permission).
[7] Our Legislature has not transformed into a burglary every crime a person commits inside his or her own home, absent proof of some additional element, such as violation of an order excluding the defendant from the home. For example, absent such additional element, neither a domestic violence assault nor a murder inside the defendant's own home would also constitute a burglary. Thus, our Legislature has avoided opening a Pandora's Box of myriad burglary prosecutions it did not contemplate including under RCW 9A.52.020.
[8] As we noted in Grantham, which involved sequential rapes of the same victim,

Grantham, upon completing the act of forced anal intercourse, had the time and opportunity to pause, reflect, and either cease his criminal activity or proceed to commit a further criminal act. He chose the latter, forming a new intent to commit the second act. The crimes were sequential, not simultaneous or continuous. The evidence also supports the trial court's conclusion that each act of sexual intercourse was complete in itself; one did not depend upon the other or further the other.
Grantham, 84 Wash.App. at 859, 932 P.2d 657.