2 P.3d 974 (2000)
101 Wash.App. 80
STATE of Washington, Respondent,
v.
Jeffrey J. JACOBS, Appellant.
No. 24352-1-II.
Court of Appeals of Washington, Division 2.
May 26, 2000.
Publication Ordered June 16, 2000.
*975 W. David Rovang, Eric Michael Fong, Rovang, Fong & Associates (Court Appointed), Port Orchard, for Appellant.
Russell D. Hauge, Prosecuting Attorney, Randall Avery Sutton, Kitsap County Deputy Pros. Atty., Port Orchard, Pamela Beth Loginsky, *976 Wa. Assoc. of Pros. Attys., Olympia, for Respondent.
HUNT, J.
Jeffrey J. Jacobs appeals his felony conviction for violating a domestic violence no-contact order. Jacobs argues the trial court erred in ruling that: (1) he lacked standing to object to the warrantless search of the victim's residence; (2) "a No Contact Order trumps [Jacobs'] privacy interests when [Jacobs] was located in a residence not listed in the No Contact Order"; and (3) the warrantless search was justified by the emergency exception to the warrant requirement. Holding that Jacobs had no standing to challenge the warrantless search of the victim's home, we affirm.

FACTS
In June 1997, Kitsap County District Court entered a domestic violence no-contact order prohibiting Jacobs "from making any attempts to contact ... James Russell." In July 1997, Jacobs was convicted of second degree criminal trespass and fourth degree assault (domestic violence) and again ordered to "[h]ave no contact with ... James Russell." Jacobs was convicted multiple additional times for violating the no-contact order and ordered to "not have any contact w/James Russell": in August 1997, in October 1997, and in February 1998. In June 1998, Jacobs was convicted of attempting to violate the no-contact order and once again ordered to "[h]ave no contact w/James Russell." Another domestic violence no-contact order was entered, again restraining Jacobs from "making any attempts to contact ... James Russell."
On November 17, 1998, at 5:30 a.m., a person identifying himself as "James" called 911 from 3736½ "F" Street in Bremerton, but then hung up the telephone. Dispatch notified deputy Nicole Bergmann, who headed to the residence. A few minutes later, James called 911 back, stated "things had gotten out of hand last night," and hung up. Dispatch notified Bergmann, who was still en route.
Deputy Bergmann stopped down the street from the residence and waited for back-up. Dispatch advised her that there had been numerous prior instances of domestic violence at the "F" Street address, causing injury to the victim, James. Dispatch told Bergmann that they had telephoned James, who stated: there was no longer a problem; the person with whom he had an altercation had left; and he (James) did not want contact with police.
Following the arrival of back-up Deputy Birkenfeld, Bergmann and Birkenfeld approached the residence; saw a person, later identified as James Russell, exit the residence, go back in, and then exit once more; and contacted James at the front gate. James "said [the deputies] couldn't really enter"; appeared intoxicated; and "was talking exceptionally fast, flailing his arms about." He initially told the deputies that there was no problem, but then conceded, "[Jeffrey] was beating on me" but "Jeffrey left." James indicated he had bruises from the beating, but did not show them to the deputies; "He kept saying, `It's fine, he's left. Everything is fine.'"
James told the deputies that no one, except for his small dog, was in the residence. When Bergmann asked to "look ... inside the residence briefly to make sure no one was in there with a gun waiting for him, no one was in there injured," James responded, "No, no, you can't come in my residence," "I have a big dog, I have a very big dog in there." As Bergmann walked away to check the exterior of the residence, she overheard James tell Birkenfeld that "Chad" was the person who had assaulted him and that "Chad" had left.
Bergmann returned, telling James that she "felt obligated to check his residence ... to briefly look inside to make sure that no one was inside bleeding, hurt, or anything like that." She believed there was no time to get a warrant because "the time period that it would take ... to get a warrant, somebody could be dying, bleeding out, who knows." Bergmann was also aware, based on her training and experience, that victims of domestic violence are sometimes uncooperative with police because they fear retribution *977 from their abusers. James tried to prevent Bergmann from entering the residence and Birkenfeld restrained him.
Bergmann entered the residence and saw Jacobs sitting on the couch, rolling a cigarette. Bergmann ascertained his identity and relayed it to dispatch, who informed her of the existence of a domestic violence no-contact order "with Mr. Jacobs as the respondent and Mr. Russell as the petitioner." Bergmann then arrested Jacobs.
The State charged Jacobs with "VIOLATION OF A NO CONTACT ORDER  DV," having committed the crime against a family or household member, and having at least two prior convictions for violating no-contact orders. See RCW 26.50.110. Jacobs filed a CrR 3.6 motion, seeking to suppress evidence of his presence at James Russell's residence. At the CrR 3.6 hearing, Jacobs testified that: prior to his arrest, he lived with friends or in a park; he stored his clothes at James Russell's residence, on top of a bureau inside the front door; he came over regularly with Russell's permission to shower and change clothes; and on November 17, 1998, Russell was present when he (Jacobs) came over.
The trial court denied Jacobs' CrR 3.6 motion and entered the following conclusions of law at issue here on appeal:

II.
Jacobs ... lacks standing to challenge the legality of the search and seizure of the residence at 3736½ "F" Street, based on his admitted violation of the no contact order, and on State v. Dejarlais, 88 Wash. App. 297, 944 P.2d 1110 (1997), aff'd[,] [136 Wash.2d 939, 969 P.2d 90 (1998) ]. In Dejarlais, the Court held that "legislative intent and public policy dictates that reconciliation and consent should not void a domestic violence protection order." Id[.] at 303, 944 P.2d 1110.
Because James Russell was at the residence when Jeffrey Jacobs was arrested, and Jacobs admits to having contact with him despite the No Contact Orders, Russell [sic] was not lawfully at the residence, and therefore cannot claim a privacy interest in the residence.

III.
Jacobs also lacks standing to challenge the search and seizure based on the ruling in State v. Picard, 90 Wash.App. 890, [954] P.2d [336, review denied, 136 Wash.2d 1021, 969 P.2d 1065] (1998). Under Picard, the defendant had no possessory or privacy interest in the place to be searched, his mother's bedroom, despite living in the residence, because he had no right to enter the room without permission. Jacobs may have been invited into the residence by Russell for limited purposes, but that did not raise his possessory or privacy interest in the residence to the requisite level required by Picard ... particularly in that, even with Russell's permission Jacobs was barred by law from being there, as noted in the previous paragraph.

IV.
This Court further concludes that even if [Jacobs] did have standing to challenge the search and seizure, the entry into the residence by Deputy Bergmann was lawful and correct, based on the Emergency and/or Exigent Circumstances Doctrine, as set forth in State v. Menz, 75 Wash.App. 351, 880 P.2d 48 (1994)....
....
In the case at hand, the officers ... had [knowledge of] a history of domestic violence at the residence, with Russell as the victim. They had assertions by Russell that he had been beaten up. They had several 911 calls made by Russell. They had suspicious behavior by Russell, including a continuously changing story. Moreover, the deputy, who had extensive experience dealing with domestic violence situations, knew that it was not uncommon for domestic violence victims to protect the perpetrator, either out of fear or misguided loyalty....
The deputies had an obligation under the law to further investigate the incident, including checking the inside of the residence for any additional victims ... and persons that might pose a threat to the victim they had already contacted....
*978 Following a bench trial on stipulated facts, the trial court found Jacobs guilty as charged.

ANALYSIS

I. Standing
The Fourth Amendment to the United States Constitution commands that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. Washington Constitution article I, section 7, provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, § 7.
[T]he Fourth Amendment operates on a downward ratcheting mechanism of diminishing expectations of privacy, [whereas] article I, section 7, holds the line by pegging the constitutional standard to "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant."
State v. Ladson, 138 Wash.2d 343, 349, 979 P.2d 833 (1999) (quoting State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984)).
Jacobs attempts to invoke the greater search and seizure protections typically provided by article I, section 7 of our state constitution but he does not engage in a Gunwall[1] analysis. State v. Parker, 139 Wash.2d 486, 493 n. 2, 987 P.2d 73 (1999); Ladson, 138 Wash.2d at 348, 979 P.2d 833. There are no reported cases in which a Gunwall analysis has been performed to determine the scope of constitutional protections guaranteed to a criminal defendant who, like Jacobs, only showers and stores his clothing at a residence, and who is prohibited by law from contacting the residence's owner. Because Jacobs has failed to engage in the mandatory Gunwall analysis, we decide his constitutional claims under federal constitutional law. See City of Spokane v. Douglass, 115 Wash.2d 171, 176-77, 795 P.2d 693 (1990).
To qualify for Fourth Amendment protection, a criminal defendant must, at a minimum, show that he or she has standing to contest the invasion of privacy. State v. Jackson, 82 Wash.App. 594, 601-02, 918 P.2d 945 (1996). Standing "to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). This involves "a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).
In Rakas, the United States Supreme Court noted that society does not recognize as reasonable the privacy rights of a defendant whose presence at the scene of the search is "wrongful":
Obviously, ... a "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate."
Rakas, 439 U.S. at 143 n. 12, 99 S.Ct. 421.[2]
Here, Jacobs was prohibited by court order from contacting or attempting to contact James Russell, the owner of the residence in which police discovered Jacobs. And on the date of the arrest, Jacobs had contact with Russell at the residence. Although Jacobs kept clothing at Russell's residence and, with Russell's permission, came over regularly to shower and change clothes, *979 Jacobs did not live there; rather, he lived with various friends or in a park.
A domestic violence no-contact order is not vitiated by reconciliation between the abuser and his victim or by the victim's consent to the contact. State v. Dejarlais, 88 Wash.App. 297, 302-03, 944 P.2d 1110 (1997), aff'd, 136 Wash.2d 939, 969 P.2d 90 (1998). Further, Jacobs did not present any evidence at the CrR 3.6 hearing that he was an "overnight guest" in the residence, with a legitimate expectation of privacy under Minnesota v. Olson, 495 U.S. 91, 98, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). Consequently, Bergmann's warrantless entry into Russell's home did not invade Jacobs' legitimate expectation of privacy, and therefore, Jacobs has no standing to challenge the search. We hold that the trial court did not err in refusing to suppress the search.

II. Vagueness
Jacobs argues that
the No Contact Order did not say that Mr. Jacobs was prohibited from going into Mr. Russell's residence. Thus to deprive him of Constitutional protection without notice would violate the vagueness doctrine.
But Jacobs cannot "show beyond a reasonable doubt that ordinary people cannot understand what constitutes illegal conduct from the language of the" two no-contact orders. State v. Hendrickson, 129 Wash.2d 61, 82, 917 P.2d 563 (1996).
Each one-page "No Contact Order" explicitly proscribes "making any attempts to contact ... James Russell" and is signed by Jacobs. Moreover, Jacobs had been issued and had signed two such orders over a two-year period prohibiting his contact with Russell. In addition, as sentencing conditions following three separate convictions against Jacobs, the Kitsap County District Court had explicitly imposed the requirement that Jacobs "[h]ave no contact w/James Russell." An ordinary person would understand that being in James Russell's home violated the orders. In short, Jacobs had notice that his conduct on November 17, 1998, was proscribed. Because our resolution of the standing and vagueness issues is dispositive, we need not address Jacobs' remaining arguments.[3] Affirmed.
ARMSTRONG, C.J., and SEINFELD, J., concur.
NOTES
[1] State v. Gunwall, 106 Wash.2d 54, 61-62, 65-67, 720 P.2d 808, 76 A.L.R.4th 517 (1986).
[2] For example, courts have ruled that criminal defendants have no expectation of privacy in hotel rooms acquired by fraud, People v. Satz, 61 Cal.App.4th 322, 71 Cal.Rptr.2d 433, 435 (1998); United States v. Wai-Keung, 845 F.Supp. 1548, 1563 (S.D.Fla.1994), or stolen vehicles, State v. Schad, 129 Ariz. 557, 633 P.2d 366, 372-73 (1981). Additionally, the Georgia Court of Appeals has recently ruled that a defendant in an arson prosecution had no reasonable expectation of privacy in the burned residence of his ex-wife because the defendant was: (1) under court order to convey his interest in the residence to his ex-wife under the terms of their divorce decree; and (2) "under a restraining order to prevent him from coming to [his ex-wife's] house." Carter v. State, 237 Ga.App. 703, 516 S.E.2d 556, 561 (1999).
[3] Even assuming Jacobs had standing to challenge the warrantless search of Russell's home, the search was justified by exigent circumstances because (1) the officers subjectively believed that someone inside might need medical assistance; (2) a reasonable person in the same situation would have similarly believed that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched in light of the preceding 911 domestic violence call. See State v. Menz, 75 Wash.App. 351, 354, 880 P.2d 48 (1994); see also Olson, 495 U.S. at 100, 110 S.Ct. 1684.