201 P.3d 371 (2009)
STATE of Washington, Respondent,
v.
John Lee WILLIAMS, Appellant.
No. 36539-1-II.
Court of Appeals of Washington, Division 2.
February 10, 2009.
*372 James Lewis Reese III, Attorney at Law, Port Orchard, WA, for Appellant.
Randall Avery Sutton, Kitsap County Prosecutor's Office, Port Orchard, WA, for Respondent.
HOUGHTON, P.J.
¶ 1 John Williams appeals his convictions of three counts of unlawful cocaine possession, arguing that the trial court erred when it denied his motion to suppress evidence seized from his hotel room. We agree and reverse.[1]

FACTS
¶ 2 On March 13, 2007, Port Orchard Police Department Sergeant Dennis McCarthy responded to a 911 call about a disturbance at a local hotel. As he pulled into the parking lot, Cledale Graham approached him and said that his nephew, Williams, was "being violent" with him and that he wanted Williams removed from his hotel room. Report of Proceedings (May 9, 2007) (RP) at 6. He added that his nephew was on parole for a crime committed in California. McCarthy called for additional assistance from Detective Marvin McKinney, and the two officers walked to Graham's hotel room with him. One of the officers knocked on the door.
¶ 3 An individual, later identified as Williams, opened the door. Williams's left hand was behind the partially-opened door *373 and not visible to the officers. McCarthy asked Williams to show his hand. The officers heard the sound of an object dropping behind the door and Williams brought his left hand into view. Williams then backed up, and the officers and Graham walked into the hotel room.[2] The officers had Williams sit down.
¶ 4 McKinney asked Williams his name and Williams said his name was Leo. McKinney, however, was suspicious because (1) Graham had identified his nephew as Williams, (2) "there are very few black males named Leo," and (3) McKinney saw a luggage tag with the name "John Williams" on it in the hotel room. RP at 25, 27. Williams could not give McKinney the year of his birth. McKinney searched records for "Leo" and did not find anything, but he did find a criminal history for a person named John Williams. At some point during this discussion, McKinney advised Williams that he was under arrest and handcuffed him.
¶ 5 While the officers were trying to identify Williams, McKinney looked around the room and saw steel wool on a dresser.[3] He testified that steel wool is often used as a filter in drug smoking devices. He then peered into a partially opened dresser drawer and saw what he believed to be rock cocaine. A search of the room post-arrest revealed rock cocaine in the dresser, a glass smoking tube behind the door, and $1,700 in cash.
¶ 6 At some point during this process, McCarthy walked outside the hotel room with Graham. Graham told him that Williams had assaulted him and had broken his jaw. McCarthy returned to the hotel room and learned that McKinney was waiting for a K-9 unit to assist with the hotel room search. The K-9 unit swept the room and the officers transported Williams to the jail. During a later search at the jail, an officer found two crack pipes on Williams.
¶ 7 The State charged Williams with one count of unlawful possession of cocaine.[4] He moved to suppress the evidence seized at the hotel room. After a CrR 3.6 hearing, the trial court entered findings of fact and conclusions of law. It concluded that the community caretaking function allowed the officers to enter the room.
¶ 8 In addition, the trial court found that the officers did not seize Williams when they initially asked him for identification. It found that Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), justified the officer's request for Williams to sit in a chair. Finally, it concluded that the officers had probable cause to arrest Williams for making a false statement, and they properly searched the hotel room incident to the legal arrest.
¶ 9 A jury found Williams guilty on all counts. He appeals.

ANALYSIS

Search and Seizure
¶ 10 Williams first contends that the police did not legally enter the hotel room. He asserts that the officers' actions violated both the federal and state constitutions.[5]
¶ 11 The Fourth Amendment to the United States Constitution states that "[t]he right of the people to be secure in their persons, *374 houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The more protective Washington Constitution article I, section 7, provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."
¶ 12 Washington law requires us to presume warrantless searches and seizures as unreasonable and a violation the Fourth Amendment unless an exception applies. State v. Duncan, 146 Wash.2d 166, 171-72, 43 P.3d 513 (2002). The State bears the burden of showing one of those exceptions applies. Duncan, 146 Wash.2d at 172, 43 P.3d 513. We review conclusions of law entered by a trial court at a suppression hearing de novo and its findings of fact for substantial evidence. State v. Sadler, 147 Wash.App. 97, 123, 193 P.3d 1108 (2008); State v. Carter, 151 Wash.2d 118, 125, 85 P.3d 887 (2004).
¶ 13 The trial court primarily relied on State v. Jacobs, 101 Wash.App. 80, 83, 86-89, 2 P.3d 974 (2000), in concluding that the officers could legally enter the hotel room without a warrant. The exception set out in Jacobs, provides that officers may enter a residence if
(1) the officers subjectively believed that someone inside might need medical assistance; (2) a reasonable person in the same situation would have similarly believed that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched in light of the preceding 911 domestic violence call.
101 Wash.App. at 89 n. 3, 2 P.3d 974.
¶ 14 A proper community caretaking function and the related emergency aid exception are separate from a criminal investigation. State v. Kinzy, 141 Wash.2d 373, 386-88, 5 P.3d 668 (2000). Where an officer's primary motivation is to search for evidence or make an arrest, the caretaking function does not create any exception to the search warrant requirement. See State v. Gocken, 71 Wash.App. 267, 275-77, 857 P.2d 1074 (1993).
¶ 15 With respect to the entry here, the trial court ruled they had the requirement to go to the door and to start a community caretaking process, which would allow them to enter the room....
It doesn't matter to this Court whether or not Mr. Graham offered consent or was asked for consent. In my opinion, the police officers did not need consent at that point. And, indeed, for the safety and protection of individuals, frequently, there may be other events going on, that an individual may have to say things or not give consent, because there may be hostages, there may be other events. They have to assume, given a domestic violence situation, assaultive behavior, that they have to go in and check the premises. In light of the behavior at the door, the entry was lawful in my opinion.
RP at 76-77.
¶ 16 Two cases, Jacobs and State v. Menz, 75 Wash.App. 351, 880 P.2d 48 (1994), illustrate that officers do not need to know that an alleged victim is inside a residence with an alleged attacker in order to justify a warrantless entry. In Jacobs, the victim previously obtained a no-contact order against the defendant. One morning, the victim made a 911 call but called back to say he did not need assistance. Officers approached the residence and saw the victim leave the house, enter it, and leave again. The victim came to the front gate and appeared intoxicated. He told the officers that the defendant "was beating" him but also stated that the defendant had left. Jacobs, 101 Wash.App. at 83, 2 P.3d 974. The victim did not want the police to enter, but an officer told the victim that she was worried that other people were in the house and might be injured. Jacobs, 101 Wash.App. at 83, 2 P.3d 974. The officer entered the house and saw the defendant. She arrested him for violation of the no-contact order. Jacobs, 101 Wash.App. at 84, 2 P.3d 974. The opinion in Jacobs noted that the entry was justified.
¶ 17 In Menz, officers responded to a domestic violence call. They saw the front door to the residence open and heard a television on. They knocked and announced, but *375 no one came to the door. They then entered to make sure that any occupants were safe. Menz, 75 Wash.App. at 353, 880 P.2d 48. They found marijuana plants growing in a bedroom. Again, the trial court held that the entry justified.
¶ 18 With these cases in mind, we address the three factors necessary to allow warrantless entry under the community caretaking/emergency aid exception. The first factor requires officers to subjectively believe that they need to enter the residence to provide medical assistance. The trial court's factual findings reference that Graham stated to the officers that Williams had been violent and that the officers had no reason to disbelieve Graham. It concluded that the officers had the right to accompany Graham to the room to speak with Williams. It added that the community caretaking exception also allowed officers to enter the hotel room. Missing from the factual findings, conclusions of law, and testimony of the officers, however, is any indication that before entering, officers actually believed that someone inside the hotel room might need medical assistance or be in danger.
¶ 19 The State essentially admits that this was not the case by arguing that the officers could use the community caretaking function to remove Williams from the hotel room or to ensure Graham's safe re-entry into the room. It argues by example that unless the exception applied, "where a homeowner reported a burglar or violent guest in his or her home, if the homeowner sought refuge at a neighbor's before the police arrived, the police would be powerless to immediately enter the home at the owner's request to ensure the owner's safe reentry." Resp't's Br. at 12. It relies on cases[6] other than Jacobs and Menz that restate the relevant factors in slightly broader terms to include not only risks to health but also safety: The emergency exception justifies a warrantless entry when (1) the officer subjectively believes that there is an immediate risk to health or safety, (2) a reasonable person in the same situation would come to the same conclusion, and (3) there is a reasonable basis to associate the emergency situation with the place searched. Gocken, 71 Wash.App. at 276-77, 857 P.2d 1074.
¶ 20 Even under the first factor, as set out in Gocken, to affirm the trial court's conclusion that the officers' warrantless entry into the hotel room in this matter, we would have to take a broader view of the emergency aid exception than current cases support. The Washington cases applying the exception, even Jacobs and Menz, contain some evidence to support that the officers believed they needed to enter a residence because of an ongoing risk to the health or safety of someone inside the residence. Menz, the case in which officers arrived at a house with the door open and the television on, states, "The officers testified that they subjectively believed someone in the home might need help." 75 Wash.App. at 354, 880 P.2d 48. In Jacobs, the case in which the victim met the officers outside the residence, an officer stated to the victim that "she `felt obligated to check his residence ... to briefly look inside to make sure that no one was inside bleeding, hurt, or anything like that.'" 101 Wash.App. at 83-84, 2 P.3d 974.[7]See also State v. Johnson, 104 Wash.App. 409, 418, 16 P.3d 680 (2001) (stating that the trial court found *376 that the deputy subjectively believed that someone in the house might need help).
¶ 21 In contrast, in a case in which officers had "no information that someone inside the trailer was injured," we reversed a trial court's conclusion that officers properly entered the trailer without a warrant. State v. Schlieker, 115 Wash.App. 264, 271, 62 P.3d 520 (2003); see also State v. Thompson, 151 Wash.2d 793, 802-03, 92 P.3d 228 (2004) (stating that no threat to health or safety justified officer's entry into trailer to retrieve a jacket); State v. Ibarra-Raya, 145 Wash. App. 516, 523, 187 P.3d 301 (2008) ("No immediate risk to health or safety [was] shown" to justify officers' warrantless entry into allegedly vacant house.).
¶ 22 Here, the findings of fact and the officers' testimony do not indicate any concern that somebody inside the hotel room was in immediate danger. Graham never stated that any person other than Williams was in the hotel room or had traveled with them to the hotel. Moreover, unlike a larger residence in which victims could be located far from the front door, much of the hotel room was visible to the officers when Williams opened the door. This case, therefore, fails to satisfy the first prong of the emergency aid exception.
¶ 23 The State also argues that because this matter involved domestic violence as defined in RCW 10.31.100(2)(c), the officers acted lawfully in entering the room.[8] RCW 10.31.100(2)(c) allows an officer to effect a warrantless arrest if he or she has probable cause to believe that a person 16 years or older, within the preceding four hours, assaulted a family member and caused bodily injury, even if not visible to the officer, or caused that person to fear imminent serious bodily injury or death. The definition of "family member" includes an adult uncle and an adult nephew. RCW 10.99.020(3) (also includes "adult persons related by blood or marriage").
¶ 24 The record, however, lacks sufficient support that any alleged assault occurred within four hours prior to Graham's 911 call. RCW 10.31.100(2)(c). The trial court found that "Graham told Officer McCarthy that John Williams, the defendant, was being violent, had assaulted him, had stolen money from him and was threatening him." Clerk's Papers (CP) at 19. Graham stated that "the defendant had punched him in the jaw on the way up from California." CP at 21. The trial court added during the CrR 3.6 hearing that "given a domestic violence situation [and] assaultive behavior, ... they have to go in and check the premises." RP at 77. Therefore, while the record supports that Williams had been violent to Graham at some point, but there is no indication when any assault occurred.
¶ 25 Another factor that indicates the officers did not believe RCW 10.31.100(2)(c) applied is that, although they testified they had probable cause to arrest Williams for making a false statement, no one testified regarding probable cause to arrest for domestic violence/assault. Moreover, the State's reliance on the community caretaking exception is directly at odds with a position that officers could enter the hotel room to effect a warrantless arrest. As noted, a proper community caretaking function and the related emergency aid exception cannot overlap with a search performed during a criminal investigation. Kinzy, 141 Wash.2d at 387-88, 5 P.3d 668. Where an officer's primary motivation is to search for evidence or make an arrest, the caretaking function does not create any exception to the search warrant requirement. See Gocken, 71 Wash.App. at 275-77, 857 P.2d 1074.
¶ 26 Another potential means to legalize the entry is to find that Graham invited the officers to enter the hotel room. State v. Ramirez, 49 Wash.App. 814, 817, 746 P.2d 344 (1987) ("for purposes of the Fourth Amendment, the constitutional protections afforded homes are extended to other residential premises such as rented hotel rooms"). Again, the State did not argue this before the trial court, although there is some evidence in the record touching on the issue *377 of consent. Consent to a search by one having the authority to give such consent constitutes one exception to the warrant requirement. State v. Mathe, 102 Wash.2d 537, 541, 688 P.2d 859 (1984). "Where two persons have equal right to the use or occupancy of the premises, either one can authorize a search." State v. Bellows, 72 Wash.2d 264, 268, 432 P.2d 654 (1967). But where both persons are present,
[w]e have been quite explicit that under our constitution, the burden is on the police to obtain consent from a person whose property they seek to search. In obtaining that consent, police are required to tell the person from whom they are seeking consent that they may refuse to consent, revoke consent, or limit the scope of consent. State v. Ferrier, 136 Wash.2d 103, 116, 960 P.2d 927 (1998). We have never held that a cohabitant with common authority can give consent that is binding upon another cohabitant with equal or greater control over the premises when the nonconsenting cohabitant is actually present on the premises. We have never held that a person is not present in her home unless and until the police come upon her. We decline to do so now.
State v. Morse, 156 Wash.2d 1, 13, 123 P.3d 832 (2005).[9] Consequently, even had Graham consented to the entry, the officers did not ensure that Williams validly consented as well. As a result, we cannot conclude that the officers acted legally in entering the hotel room. Cf. State v. Raines, 55 Wash.App. 459, 462, 778 P.2d 538 (1989) (addressing whether homeowner gave implied waiver of right to exclude officers).[10]
¶ 27 We reverse and remand with instructions to suppress the evidence.
I concur: ARMSTRONG, J.
HUNT, J. (dissenting).
¶ 28 I respectfully dissent. I would uphold the trial court's denial of Williams' motion to suppress the evidence and affirm his conviction.

I. Pertinent Facts
¶ 29 As the majority acknowledges, the police responded to Graham's 911 call for help in removing his nephew, Williams, from his (Graham's) motel room because Williams was "being violent that night." As soon as the police arrived in the motel parking lot, Graham approached them and explained that Williams had threatened him, had assaulted him, had taken his money, and had been acting violently during their entire recent drive from California to Washington. Graham also told the police that Williams was on parole for a crime committed in California and that Williams "wasn't supposed to be up here."
¶ 30 Graham had paid for the motel room, which was registered in his name; Williams' name was not on the motel registration. Graham led the police to his motel room, where they met Williams at the door. Williams partially opened the door, concealing part of his body behind the door. At that point, one officer heard something drop behind the door and asked to see Williams' hands. Williams opened the door completely and stepped back into the motel room. Graham walked into his motel room, inviting the police to enter. As explained in the next section of my dissent, contrary to Williams' and the majority's assertion, the police entry into Graham's motel room at Graham's invitation was not unlawful.
¶ 31 Inside Graham's motel room, Williams gave the police a false name, and they arrested *378 him for giving false information. During a search incident to Williams' arrest, the police found crack cocaine in an open dresser drawer and a crack pipe on the ground behind the motel room door where Williams had been standing when they heard something drop to the ground. Because the police entered Graham's motel room with his consent and for the purpose of protecting Graham from his violent nephew, their encounter with Williams inside was not the product of unlawful police action giving rise to grounds for suppression of the evidence seized during the search incident to Williams' arrest.

II. ANALYSIS
¶ 32 The officers' entry into Graham's motel room in response to his request for aid falls under at least two exceptions to the warrant requirement: consent, State v. Morse, 156 Wash.2d 1, 8, 123 P.3d 832 (2005); and community caretaking function/emergency investigation, State v. Menz, 75 Wash.App. 351, 353, 880 P.2d 48 (1994), review denied, 125 Wash.2d 1021, 890 P.2d 463 (1995). Williams' consent was not required.

A. Consent
¶ 33 Under Article I, Section 7 of our constitution, the necessity of a present cohabitant's consent to a search is determined under the "common authority" rule. Morse, 156 Wash.2d at 7, 123 P.3d 832. Washington case law bases this rule on theories of "reasonable expectations of privacy" by the searched individual and "assumption of risk" of a search. Id. at 7, 8, 123 P.3d 832. To qualify as a cohabitant for purposes of common authority, a person must possess equal control over the premises. Id. at 18, 123 P.3d 832 (Fairhurst, J., concurring) (citing State v. Thompson, 151 Wash.2d 793, 805, 92 P.3d 228 (2004)). Here, the record shows that Williams did not possess equal control over the motel room.
¶ 34 The facts giving rise to consent to enter here differ from cases in which officers initiate contact at a home or apartment, for example, and then ask the occupant(s) for consent to enter. Here, the officers did not initiate contact; rather, it was the victim who called 911 and summoned the officers to the motel. Washington courts have found equal control and common authority in cases where all cohabitants were signatories on the premises lease, State v. Leach, 113 Wash.2d 735, 738, 782 P.2d 1035 (1989), and where a married couple jointly occupied the premises, State v. Walker, 136 Wash.2d 678, 681, 965 P.2d 1079 (1998). In contrast, our courts have not found equal control and common authority where a son was living on only a portion of his parents' property and did not pay rent. Thompson, 151 Wash.2d at 807-08, 92 P.3d 228.
¶ 35 Unlike the cohabitants in Leach and Walker, Williams was neither a signed registrant for Graham's motel room nor the spouse of the sole registered inhabitant, Graham. In addition, like the son in Thompson, Williams had not paid for the motel room. Rather, at best, Williams was inside Graham's motel room only at Graham's earlier invitation, which invitation Graham had terminated. Therefore, Williams was not a cohabitant of the motel room, nor did he possess equal control/authority over it. As a result, Williams' consent to the search of Graham's room was unnecessary. In other words, lack of Williams' consent did not vitiate Graham's invitation and consent for the officers to enter his (Graham's) motel room to help evict his assaultive, thieving, out-of-control nephew. Accordingly, I would affirm the trial court's denial of Williams' motion to suppress the evidence based on the consent exception to the warrant requirement.

B. Community Caretaking/Emergency
¶ 36 Alternatively, I would affirm the trial court on the community caretaking/emergency exception ground.[11] The following cases set forth the applicable legal standard for satisfying the sometimes-overlapping emergency/community caretaking exceptions[12] to the warrant requirement.

*379 1. Menz

¶ 37 State v. Menz, 75 Wash.App. 351, 880 P.2d 48 (1994), review denied, 125 Wash.2d 1021, 890 P.2d 463 (1995)[13] establishes that this exception to the warrant requirement encompasses situations requiring some form of police assistance with public health or safety. Menz also clarifies the purpose of this emergency exception, which "recognizes the community caretaking function of officers, and exists so officers can assist citizens and protect property." Menz, 75 Wash.App. at 353-54, 880 P.2d 48 (citing State v. Swenson, 59 Wash.App. 586, 589, 799 P.2d 1188 (1990)); see also State v. Hutchison, 56 Wash. App. 863, 865-66, 785 P.2d 1154 (1990)); State v. Sanders, 8 Wash.App. 306, 310, 506 P.2d 892, review denied, 82 Wash.2d 1002 (1973) ("Police officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance."); State v. Nichols, 20 Wash.App. 462, 465, 581 P.2d 1371, review denied, 91 Wash.2d 1004 (1978) (police responding to a reported fight could enter a garage because they had reasonable grounds to believe their assistance was necessary for the protection of life).
¶ 38 In Menz, a case on which the majority relies here, we held that the emergency/community caretaking exception applies when (1) the officer subjectively believes that someone likely needs assistance for health or safety reasons, (2) a reasonable person in the same situation would similarly believe that there was a need for assistance, and (3) there is a reasonable basis to associate the need for assistance with the place searched. Menz, 75 Wash.App. at 354, 880 P.2d 48 (citing State v. Gocken, 71 Wash.App. 267, 276-77, 857 P.2d 1074 (1993), review denied, 123 Wash.2d 1024, 875 P.2d 635 (1994)) (emphasis added).
¶ 39 Here, as in Menz, the officers were responding to a report of domestic violence; and a reasonable person in the responding officers' situation would believe that Graham likely needed their assistance in entering his motel room to remove his violent nephew so that Graham could safely reenter.[14] Graham told the officers that (1) he and his nephew, Williams, had driven together from California to Washington, during which trip Williams had repeatedly assaulted him (Graham) and had stolen from him; (2) Williams had been staying with Graham in Graham's motel room; (3) Williams was becoming increasingly violent and agitated; and (4) Williams would not leave, as Graham had requested.[15]
*380 ¶ 40 In Menz, the police were responding to an anonymous report. Here, in contrast, the 911 call was not anonymous; on the contrary, caller and assault victim Graham met the responding officers in the motel parking lot and led them to his motel room, where his assailant nephew remained. Thus, the facts here even more strongly support application of the emergency exception than those in Menz. Accordingly, as we held in Menz, I would similarly hold here that the emergency/community caretaking exception applies.

2. Jacobs

¶ 41 The majority also relies on another opinion from our court, State v. Jacobs, 101 Wash.App. 80, 2 P.3d 974 (2000). Jacobs establishes that the emergency aid exception also encompasses public safety concerns that justify entry even when the police have no reason to believe that someone inside the building is injured.[16]
¶ 42 I agree with the majority's recitation of the following facts in Jacobs: The officer expressed a desire to enter the residence due to a concern for the health of someone still inside. Jacobs, 101 Wash.App. at 83-84, 2 P.3d 974. But the officer also expressed a desire to enter the residence to "make sure no one was in there waiting with a gun" for the victim. Id. at 83, 2 P.3d 974. We concluded that the officers had a duty to check inside the residence for both additional victims and persons who might pose a threat to the victims the officers had already contacted. Id. at 85-86, 2 P.3d 974.
¶ 43 In several significant respects, the case before us is analogous to Jacobs. In both cases, the victims were outside their respective residences when they came in contact with and told the police about having been assaulted. Id. at 83, 2 P.3d 974. In both cases, the police possessed a subjective belief of an ongoing safety risk. Here, their subjective belief in a safety risk increased when Graham led them to his motel room and, according to one officer, the conversation with Williams at the motel room door was "turning heated" and "becoming a safety concern." In addition, the officers heard Williams drop something from his hand concealed behind the partially open motel room door.
¶ 44 In addition to these similarities, the facts in our case more strongly support the emergency aid exception than do the facts in Jacobs: Not only did the victim in Jacobs fail to consent to the police entry into the residence, but also the victim asserted that his assailant was no longer inside. Here, in contrast, Graham not only consented but also actively invited the officers to enter his motel room, where Graham told the officers his *381 assailant, Williams, remained.[17]
¶ 45 In short, in fulfilling their community caretaking function, the officers as Graham's invitees, had his consent and, thus, lawful authority to be inside Graham's motel room, where they encountered Williams and observed his drug paraphernalia in plain view and during a search incident to his arrest. Accordingly, I would hold that the warrantless entry here is even more reasonable and justified than the entry in Jacobs under the emergency/community caretaking exception.
¶ 46 I would uphold the trial court's denial of Williams' motion to suppress on the consent ground alone. Alternatively, I would uphold the trial court's denial of Williams' motion to suppress on the emergency/community caretaking exception to the warrant requirement.[18] I would, therefore, also affirm Williams' conviction.
NOTES
[1] Williams also assigns error based on ineffective assistance of counsel and trial court error in denying his motion to dismiss two counts of unlawful cocaine possession. Because we reverse, we do not address these arguments.
[2] At the CrR 3.6 hearing, McCarthy testified that the officers walked into the room with Graham; McKinney testified that Graham entered first and gave the officers permission to enter. The trial court's findings of fact do not indicate whether Graham gave the officers permission to enter. No findings of fact support that Williams gave officers permission to enter, and the State did not argue that Williams gave permission.
[3] McKinney testified that he looked around the room before the arrest and searched it post-arrest.
[4] After a CrR 3.5 hearing, the State added a second count of possession for cocaine discovered on Williams at the Kitsap County Jail and later added a third count to address cocaine Williams dropped behind the door of the hotel room. It further amended the information a final time, correcting certain dates.
[5] Williams's argument centers on whether the community caretaking exception to the warrant requirement should be recognized under article I, section 7 of the state constitution. In State v. Johnson, we addressed this issue and declined to hold that the state constitution does not allow this warrant exception. 104 Wash.App. 409, 416-18, 16 P.3d 680 (2001).
[6] State v. Johnson, 104 Wash.App. 409, 418, 16 P.3d 680 (2001) (authorizing entrance when an officer "believes that someone likely needs assistance for health or safety reasons"); State v. Lynd, 54 Wash.App. 18, 21, 771 P.2d 770 (1989) (authorizing search if an officer needed to "`render aid or assistance'" (quoting State v. Loewen, 97 Wash.2d 562, 568, 647 P.2d 489 (1982))).
[7] The dissent states that one reason for the warrantless entry in Jacobs was the officer wanted to enter to be sure that nobody inside the house was armed. Dissent at ____ (citing Jacobs, 101 Wash. App. at 83, 2 P.3d 974). The reason stated by the officer immediately prior to entering was that she "`felt obligated to check his residence ... to briefly look inside to make sure that no one was inside bleeding, hurt, or anything like that.'" She believed there was no time to get a warrant because "`the time period that it would take ... to get a warrant, somebody could be dying, bleeding out, who knows.'"

Jacobs, 101 Wash.App. at 83-84, 2 P.3d 974. Consequently, the court concluded that warrantless entry was justified because "the officers subjectively believed that someone inside might need medical assistance." Jacobs, 101 Wash.App. at 89 n. 3, 2 P.3d 974 (emphasis added). The court did not address any other alleged reason for entering the house.
[8] The State did not raise this argument before the trial court. We may, however, affirm on any ground the record supports, even if the trial court did not consider the argument. State v. Michielli, 132 Wash.2d 229, 242-43, 937 P.2d 587 (1997).
[9] The dissent believes that Graham had the sole right to occupy the premises and consent to the search because he paid for the hotel room. The record, however, supports that both men had common authority over the hotel room: Graham and Williams were traveling long distances together and both stored personal effects in the hotel room. As set out in United States v. Matlock, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), common authority is established by "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right." Moreover, although the parties do not address it, Williams may also have automatic standing to object to the search. State v. Jones, 146 Wash.2d 328, 332-34, 45 P.3d 1062 (2002).
[10] Because we reverse on these grounds, we do not address Williams's argument based on Terry.
[11] Nast v. Michels, 107 Wash.2d 300, 308, 730 P.2d 54 (1986) ("[A]n appellate court may sustain a trial court on any correct ground, even though that ground was not considered by the trial court."). See also State v. Costich, 152 Wash.2d 463, 477, 98 P.3d 795 (2004).
[12] In State v. Kinzy, 141 Wash.2d 373, 387, 5 P.3d 668 (2000), cert. denied, 531 U.S. 1104, 121 S.Ct. 843, 148 L.Ed.2d 723 (2001) the Washington Supreme Court clarified the distinctions between these sometimes mislabeled or overlapping exceptions. The community caretaking exception originated in the context of automobile searches and seizures. Id. at 386, 5 P.3d 668. Washington case law then expanded the community caretaking exception to encompass situations involving emergency aid or routine checks on public health and safety, id., which possess their own separate tests. The Washington Supreme Court adopted the Menz emergency aid exception test in Kinzy, 141 Wash.2d at 386-87, 5 P.3d 668.
[13] I note that Judge Dean Morgan authored the Menz opinion, in which Judge Elaine Houghton, majority author here, and Judge Karen Seinfeld concurred.
[14] The majority correctly note that the community caretaking function and the emergency aid exception are separate from a criminal investigation. Kinzy, 141 Wash.2d at 385, 5 P.3d 668. As the facts here clearly demonstrate, however, the officers initially entered Graham's room with his consent to protect Graham and to aid him in evicting his violent nephew. It was only after this entry that the officers discovered Williams had provided them with a false name, and the officers placed him under arrest, that the matter became a criminal investigation.
[15] Because most of Williams' assaults had apparently occurred more than four hours before Graham called 911, the officers could not arrest Williams under former RCW 10.31.100(2)(c) (2006) exception to the warrant requirement, which requires an arrest for domestic violence assaults occurring within the preceding four hours. Former RCW 10.31.100(2)(c) provides:

A police officer having probable cause to believe that a person has committed or is committing a felony shall have the authority to arrest the person without a warrant. A police officer may arrest a person without a warrant for committing a misdemeanor or gross misdemeanor only when the offense is committed in the presence of the officer, except as provided in subsections (1) through (10) of this section.
...
(2) A police officer shall arrest and take into custody, pending release on bail, personal recognizance, or court order, a person without a warrant when the officer has probable cause to believe that:
....
(c) The person is sixteen years or older and within the preceding four hours has assaulted a family or household member as defined in RCW 10.99.020 and the officer believes: (i) A felonious assault has occurred; (ii) an assault has occurred which has resulted in bodily injury to the victim, whether the injury is observable by the responding officer or not; or (iii) that any physical action has occurred which was intended to cause another person reasonably to fear imminent serious bodily injury or death. Bodily injury means physical pain, illness, or an impairment of physical condition. When the officer has probable cause to believe that family or household members have assaulted each other, the officer is not required to arrest both persons. The officer shall arrest the person whom the officer believes to be the primary physical aggressor. In making this determination, the officer shall make every reasonable effort to consider: (i) The intent to protect victims of domestic violence under RCW 10.99.010; (ii) the comparative extent of injuries inflicted or serious threats creating fear of physical injury; and (iii) the history of domestic violence between the persons involved.
(Emphasis added.) Former RCW 10.99.020 includes as "family or household members" "adult persons related by blood or marriage," which would include an uncle and his nephew.
¶ But it is irrelevant here whether the police were "required" to arrest Williams under this statute. That police could not obtain probable cause for a warrantless arrest under former RCW 10.31.100(2)(c) does not negate the other community caretaking/emergency exception to the warrant requirement, supported by the facts of this case.
[16] In contrast, the majority characterizes Jacobs as involving an officer's subjective belief of a need to enter a residence only to provide medical assistance.
[17] With all due respect to my learned colleagues, their majority holding prevents Graham and persons similarly situated from seeking police intervention to remove a violent transient guest from the victim's motel room. Williams had repeatedly assaulted Graham, had stolen from Graham, and continued to behave violently toward Graham. Graham needed to enter his motel room to sleep, but could not do so with Williams remaining inside in his volatile state. Rather than resorting to "self-help" to extract Williams from his motel room so that he (Graham) could reenter safely, Graham did "the right thing" by summoning help from the police. Under the circumstances here, "self-help" likely could have resulted in additional violence, contrary to the legislature's intent in enacting the domestic violence statute, former RCW 10.31.100(2)(c).
[18] The United States Supreme Court recently refused to suppress evidence in a case in which the officers were acting in good faith, albeit based on false information. The Court stated:

To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.
Herring v. United States, ___ U.S. ___, 129 S.Ct. 695, 702, ___ L.Ed.2d ___ (2009). Applying the Supreme Court's rationale here, I ask what purpose does application of the exclusionary rule serve where both Graham and the officers who responded to his request for help acted reasonably and in a manner designed to preserve the public peace and to prevent further injuries to persons and property in safely ejecting a violent, assaultive thief from the victim's motel room?
Washington presently does not recognize a good faith exception to the exclusionary rule. Unlike the Fourth Amendment to the federal Constitution, which focuses on "the reasonableness of the government action," Article I, section 7 of the Washington State Constitution focuses on "the rights of the individual." State v. Eisfeldt, 163 Wash.2d 628, 639, 185 P.3d 580 (2008) (citing Morse, 156 Wash.2d at 12, 123 P.3d 832).
The United States Supreme Court's recent decision in Herring, however, reinforces a distinction between the foci of the Fourth Amendment and the exclusionary rule. Herring, 129 S.Ct. at 699-701. Herring explains that the exclusionary rule focuses on deterring deliberate police violations of the Fourth Amendment. Id. In contrast, Washington courts have thus far expressed an unwillingness to disconnect the exclusionary rule's deterrence rationale from protection of individual rights under article I, section 7; but our state courts have not expressly rejected the recently announced Herring principle  that violation of individual privacy rights does not automatically result in exclusion or suppression of evidence. State v. White, 97 Wash.2d 92, 109-10, 640 P.2d 1061 (1982).