FILED
COURT OF APPEALS
DIVISION II

2013 OCT -8 AM 9: 22

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42305-7-II |
| Respondent, | |
| v. | |
| JOSHUA NATHAN REESE, | UNPUBLISHED OPINION |
| Appellant. | |

HUNT, P.J. — Joshua Nathan Reese appeals his bench trial convictions and exceptional sentences for first degree felony murder, first degree burglary, two counts of first degree robbery, and two counts of second degree assault. He argues that (1) the trial court erred in denying his motion for a CrR 3.6 evidentiary hearing and in failing to suppress his statements that were the product of an unlawful traffic stop; (2) he received ineffective assistance when his trial counsel advised him to waive his right to a jury trial; (3) the State presented insufficient evidence to support his convictions for both counts of first degree robbery, one count of second degree assault, and felony murder; (4) the trial court miscalculated his offender score because several of his current offenses constituted the same criminal conduct and/or merged; and (5) the trial court erred in imposing exceptional sentences, which were clearly excessive and not supported by the record. Reese also challenges several of the trial court's findings of fact and conclusions of law.

We affirm Reese's convictions and his exceptional sentences.

FACTS

## I. HOME INVASION

### A. Burglary, Robbery, Assault, and Felony Murder

Joshua Nathan Reese and his three associates, including Amanda Knight and Kiyoshi Higashi, saw James Sanders' Craigslist posting offering to sell a diamond wedding ring, surmised that James and Charlene Sanders had other valuables in their house, and planned to "rob" them by doing a "normal house lick."[1] Ex. 136 at 3. On April 28, 2010, Knight drove Reese, Higashi, and Clabon Berniard in her car to the home of James and Charlene Sanders and their children, CK, aged 10, and JS,[2] aged 14. Knight and her passengers carried zip ties; Reese, Berniard, and Higashi also carried loaded handguns. Before entering the house, Knight used a Bluetooth device to establish a cell phone connection with Reese and Berniard, who remained in her car to listen for the code words "get down," the signal that they could enter the house and take the Sanders' valuable property. Ex. 136 at 10.

---

[1] In his police interview, Reese described the robbery plan as follows:
> [REESE:] The whole plan was, seen [sic] the ad on Craig's List [sic] for a ring. So the whole plan was, to get inside the house, 'cause if they got an expensive ring on Craig's List [sic], obviously they got something more expensive inside the house. *So the plan was just go inside the house and take everything out of the house.* That was it. I'm saying that *the plan was . . . just to go in there, basically, a normal what you'd call a robbery.* [. . .]
> [POLICE:] Okay.
> [REESE:] Street term, house lick, *just a normal house lick.* That's basically all it was.

Ex. 136 at 3 (emphasis added).

[2] It is appropriate to provide some confidentiality in this case. Accordingly, we use initials to identify the juveniles involved.

Charlene and James Sanders[3] and their two boys were watching a movie upstairs while waiting for the prospective buyer who had responded to the Craigslist posting. Knight and Higashi approached the Sanders' home, claiming to be the prospective buyers of the ring. James came downstairs to greet them. Eventually, James called Charlene to the downstairs kitchen to answer Knight's questions about the ring.

Charlene answered Knight's questions and then handed the ring to her. Higashi asked Knight if she wanted the ring; Knight responded, "[Y]es." 2 Verbatim Report of Proceedings (VRP) at 181. Higashi pulled out a "wad of cash" and said, "How about this?" 2 VRP at 182. He then pulled out a gun and said, "How about this?" 2 VRP at 182. James and Charlene told Higashi and Knight to "[t]ake it," "just take everything." 2 VRP at 182. Higashi and Knight ordered James and Charlene to "[g]et down," forced James and Charlene face down to the floor with their hands behind their backs, restrained their wrists with zip ties, and ripped their wedding rings off their fingers. 2 VRP at 182.

Charlene heard two more people "rushing in" and she "heard commotion" throughout the house. 2 VRP at 185. Two men with guns, later identified as Reese and Berniard, entered the upstairs bonus room where CK and JS were watching the movie. The men pointed their guns at CK and JS, "pulled [them] really fast downstairs" by their wrists, and laid them face down on the kitchen floor with their hands behind their backs.[4] 2 VRP at 211. One of the men with a gun began yelling at Charlene and asking her, "Where is the safe?" 2 VRP at 187. Charlene and

---

[3] We refer to Charlene and James Sanders by their first names for clarity. We intend no disrespect.

[4] Unlike their parents, however, CK's and JS's hands were not restrained with zip ties.

James again implored, "Just take everything; just take everything." 2 VRP at 187. The man responded, "I'll kill you; I'll kill them." 2 VRP at 187. When Charlene looked up to find her children, several of the intruders ordered her to lie "facedown." 2 VRP at 187.

Berniard called Charlene a "b*tch," kicked her in the head, stood over her, pointed a gun to the back of her head, cocked its hammer, and started counting down from three, demanding to know where the family's safe was located. 3 VRP at 344. Charlene thought she was going to die. When Berniard reached "[one]," Charlene told him they had a safe; and James gave Berniard a fake code. 2 VRP at 188. Berniard announced to his fellow intruders, "They have a safe," and then demanded to know where the family's second safe was located. 2 VRP at 188. Charlene told him they did not have a second safe.

Berniard and another male intruder picked James up off the floor and led him into the laundry room near the garage. CK and JS stood up; and JS followed the men and his father into the laundry room. Before they reached the garage, James broke free from his zip ties and started punching Berniard. Berniard shot his gun at James, a piece of James's ear flew off, and he fell unconscious to the floor. Charlene heard "two or three" gunshots and later learned that James had been shot three times. 2 VRP at 191.

JS jumped on Berniard's back and started choking and fighting him. Berniard "pistol whipped" JS three or four times on the head, leaving him with a concussion; bruises on his neck, face, and arms; and a gash and scar behind his left ear. 3 VRP at 346. Two of the male intruders dragged James's body into the living room. After quickly rummaging through the family's belongings upstairs, all four intruders fled out the front door.

4

Charlene found James in the downstairs living room, gasping for air. With her zip ties still on, she called 911. Paramedics arrived and pronounced James dead. Charlene had suffered an injury to her left temple, which required a CAT scan.

Detective John Jimenez and members of the Pierce County Sheriff's Department homicide team initially processed the scene. Jimenez found the contents of a woman's purse dumped out on the upstairs furniture, blood stains and two shell casings near James's body in the living room, a shell casing on the kitchen floor, and hair and blood spatter on the pattern molding near the living room door. The officers determined that the following valuable items had been stolen from the Sanders' home: the old wedding ring that James had posted on Craigslist, Charlene's and James's wedding rings, Charlene's wallet, JS's and Charlene's cell phones, a Playstation 3, an iPod touch, and an iPod charger bearing the initials "J-A-S." 3 VRP at 350.

Around 10:30 or 11:00 PM that same night, Knight dropped off Higashi at his girlfriend Jenna Ford's house. Ford noticed that Higashi had two handguns, a wallet, another person's cell phone, and a bunch of receipts in his possession. After reading the news online, Higashi called Knight, who returned with Reese in her white Crown Victoria so the three could "get a story together." 4 VRP at 433. The next morning, Knight picked up Higashi at Ford's house. Later that day, Higashi texted Ford and told her that he was out of state. Ford eventually reported Higashi and his whereabouts to the authorities.

B. Investigation

The morning of May 1, Daly City, California Police Officer Eddy Klier observed Knight driving a white Crown Victoria without a front license plate (in violation of California Vehicle Code (CVC) § 5204), made a U-turn, got behind Knight's vehicle, and followed it. Before

turning on his emergency lights, Klier noticed that the front passenger, Reese, was not wearing his seat belt (in violation of CVC § 27315). When Knight stopped in response to Klier's emergency lights, Reese immediately opened the front passenger-side door and got out. Klier ordered Reese to get back inside the car; and Reese complied. Klier asked Reese for identification, which Reese claimed he did not have. Klier asked Reese for his name; Reese responded that his name was "Niako Hatt," which did not match any records in the police system. Clerk's Papers (CP) at 345. While talking with Reese, Klier had observed Reese reach his left hand several times into his waistband. Klier was concerned for his safety because Reese was wearing a large black coat and bulky clothes capable of concealing a weapon. Higashi was in the backseat.

When backup arrived, Klier asked Reese to get out of the car so he could conduct a "pat-down search" for weapons and identification. 3 VRP at 308. Reese stood up, removed his coat, tossed it on the front passenger seat, removed an unknown object from his rear left pant leg, and handed it to Higashi in the backseat. Believing the concealed object might be a weapon or drugs, Klier detained all three occupants for further investigation and conducted a pat down search of Reese. Klier found nothing on Reese's person but later found several bags of marijuana in his coat pocket.

Knight consented to a search of her Crown Victoria, including a backpack inside, which she claimed was hers. Under the vehicle's front passenger seat where Reese had been seated, the officers found a loaded .22 caliber handgun with a red bandana on its handle. Inside Knight's backpack, the officers found a concealed weapons permit belonging to Knight and two boxes of .380 caliber and .22 caliber ammunition. Reese admitted knowing that the .22 caliber handgun

was under his seat, but he denied that it belonged to him. The officers seized the .22 caliber handgun and the ammunition from Knight's backpack; arrested Knight, Higashi, and Reese; and booked them into the San Mateo County jail. Daly City police officers notified the Pierce County Sheriff's Department that they had arrested three people matching the description of the suspects in the Sanders robbery.

On May 4 and 5, Pierce County Sheriff's Department Detective Jimenez and Lieutenant Todd Karr interviewed Reese in the San Mateo County jail. After waiving his Miranda[5] rights, Reese gave two taped statements. Reese admitted that (1) he and his fellow intruders had seen James's Craigslist posting, had believed James and Charlene had more "expensive" items inside their house, and had planned to "rob" them; (2) he (Reese) had called Berniard and asked him to help do a house "lick"; (3) their plan was to "go inside the house and take everything out" but for "nobody to get hurt"; and (4) during the robbery, Reese, Higashi, and Berniard each had loaded handguns and zip ties, and they were using Bluetooth devices to communicate with Knight. Ex. 136 at 3. Claiming he had been "upstairs the whole time," Reese denied having hit or kicked anyone inside the house. Ex. at 136 at 4. Although Reese had heard "yelling" and "gunshots" downstairs, he did not know who had shot James. Ex. 136 at 8.

Pierce County police officers eventually searched Knight's car and her backpack to collect evidence from the Sanders home invasion robbery. Inside the car, they found jewelry, a camera, four cell phones, electronic equipment, a laptop computer, an iPod, and an iPod charger bearing the initials "JAS." 2 VRP at 262. Inside Knight's backpack, they found the two boxes

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

of .22 and .380 caliber ammunition that California police officers had previously discovered, two Bluetooth devices, and several credit cards.

Ford's sister found Charlene's wallet and JS's cell phone in Ford's bedroom-and told her mother, who called police. Officers found the SIM[6] card for JS's cell phone at a house in Kent; they found Charlene's cell phone discarded along the Valley Freeway. A California police officer discovered that Knight had pawned James's wedding ring at a local pawn store; and the wedding ring that James had listed on Craigslist was discovered at a San Francisco pawn store.

On May 12, Pierce County police officers served a search warrant on the B & I shopping center in Tacoma, Washington, where they found (1) a .380 caliber handgun, holster, magazine, and ammunition, which Higashi, Knight, and Reese had sold to store manager James Matter on April 29; (2) a Playstation 3, which Knight had sold to Matter the same day; and (3) a surveillance video from April 29, showing all three suspects. The suspects had also tried to sell Matter a .22 caliber handgun, which he did not purchase.

A forensic scientist later examined the .380 caliber handgun that the police had recovered from the B & I shopping center. He determined that the handgun was operable and that the three cartridges recovered from the crime scene and the three bullet fragments recovered from James's body had been fired from this handgun. The medical examiner concluded that (1) James had died of "multiple gunshot wounds," including wounds to his left knee, groin, and back; (2) the gunshot wound to James's back was fatal; and (3) James's death a homicide. 3 VRP at 409.

---

[6] A SIM card is a small card that contains a mobile network subscriber's account information.

## II. PROCEDURE

The State charged Reese[7] with (1) first degree felony murder, Count I; (2) two counts of first degree robbery involving James and Charlene, Counts II and IV, respectively; (3) two counts of second degree assault involving JS and Charlene, Counts III and V, respectively; and (4) first degree burglary, Count VI. For all counts, the information included firearm sentencing enhancements and the following aggravating factors: (1) Reese had manifested deliberate cruelty toward his victims, RCW 9.94A.535(3)(a)[8]; (2) his crimes had involved a high degree of sophistication or planning, RCW 9.94A.535(3)(m); (3) his prior unscored misdemeanors would result in a presumptive sentence that was clearly too lenient, RCW 9.94A.535(2)(b); and (4) his multiple current offenses and high offender score would result in some of his current offenses going unpunished, contrary to RCW 9.94A.535(2)(c).

### A. Pretrial Motions

Reese moved under CrR 3.6 to suppress the statements he had made to Pierce County police officers Karr and Jimenez in the San Mateo County jail. Reese argued that (1) California police officer Klier had unconstitutionally seized Knight's vehicle when he pulled her over because he lacked reasonable suspicion that a traffic infraction or offense had occurred; and (2) consequently, Reese's statements to Klier and Jimenez in the San Mateo County jail were

---

[7] The State originally charged Knight, Higashi, Berniard, and Reese together as codefendants. The trial court granted Berniard, Reese, and Knight's motions to sever their trials from the other codefendants, resulting in four separate jury trials.

[8] The legislature has since amended this statute in 2010, 2011 and 2013. LAWS OF 2013, ch. 35 § 37,; LAWS OF 2013, ch. 256 § 2; ch. 84 § 26; LAWS OF 2011, ch. 87 § 1. LAWS OF 2010, ch. 274 § 402; ch. 227 § 10; ch. 9 § 4. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

"tainted" by this unlawful traffic stop and must be suppressed as fruit of the poisonous tree. Clerk's Papers (CP) at 156. Reese also requested a CrR 3.6 evidentiary hearing so he could cross-examine Klier about inconsistencies in his probable cause statement and his police report involving the timing of when he had noticed Reese was not wearing a seatbelt.[9]

The trial court orally ruled that (1) the factual and procedural history of Klier's traffic stop and Reese's subsequent questioning in the San Mateo County jail were "largely agreed"[10]; (2) both California and Washington law require front and rear license plates on all vehicles operated on public roadways; (3) Klier's traffic stop was proper based on Knight's vehicle lacking its front license plate; and (4) because the initial traffic stop was proper, there was no "taint" to Reese's subsequent statements in jail. 1 VRP at 135. The trial court further ruled that any inconsistencies between Klier's statements in his probable cause statement and his police report could be reconciled as being "both true"[11]; thus, there was no need for an evidentiary hearing. The trial court denied Reese's request for an evidentiary hearing and ruled his statements admissible.

After discussing a jury trial waiver for "three weeks" with counsel, Reese orally moved to waive a jury. 1 VRP at 53. According to Reese's counsel, he had advised Reese about "just about every possible pitfall" of waiving a jury and that the decision was "truly [Reese's]." 1

---

[9] In his probable cause statement, Klier stated that he had noticed Reese was not wearing his seatbelt "upon conducting the initial traffic stop." CP at 161. In his lengthier narrative police report, written the same day he had made the traffic stop, Klier stated he had noticed Reese was not wearing his seatbelt upon his "initial sighting" of Knight's vehicle. CP at 345.

[10] 1 VRP at 133.

[11] 1 VRP 134.

VRP at 53. Questioning Reese about his jury waiver, the trial court confirmed that (1) he understood his constitutional right to a jury trial; (2) he had read a copy of his written jury waiver, had reviewed it with counsel, and had "any and all questions" about the waiver answered; and (3) he had signed his written jury waiver freely and voluntarily. 1 VRP at 58. Satisfied that Reese had knowingly waived his right to a jury trial, the trial court accepted Reese's jury waiver.

### B. Trial

At Reese's bench trial, the State's witnesses testified to the facts previously described. Reese called no witnesses. The trial court found Reese guilty as charged and the firearm sentencing enhancements on all counts. The trial court also found as aggravating factors on all counts that Reese had manifested deliberate cruelty toward his victims; and that his crimes had involved a high degree of sophistication or planning.

### C. Sentence

At sentencing, Reese argued that the following paired offenses were the same criminal conduct under RCW 9.94A.589(1)(a) and asked the trial court to treat them as such: (1) first degree robbery of Charlene, Count IV, and second degree assault of Charlene, Count V; and (2) first degree burglary, Count VI, and first degree robberies of James and Charlene, Counts II and IV, respectively. The trial court denied Reese's motion. Reese also asked the court to determine that several similar pairs of convictions merged for double jeopardy purposes: (1) first degree robbery of James, Count II, and first degree felony murder, Count I; and (2) second degree assault of Charlene, Count V, and first degree robbery of Charlene, Count IV. The trial court also denied the motion. Having concluded that none of Reese's current offenses constituted the

same criminal conduct or merged, the trial court calculated Reese's offender score as 13 and determined that his standard-range sentence on the felony murder conviction would be 411-548 months of confinement, plus a mandatory 60 additional months for the felony murder count's firearm enhancement.

Because Reese's offender score was over 9 and he had multiple current offenses, the State asked the trial court to find as an aggravating factor that Reese's multiple current offenses and high offender score would result in some of his current offenses going unpunished, contrary to RCW 9.94A.535(2)(b). The trial court agreed and found this aggravating factor present on all counts. The State also presented evidence that Reese had eight unscored misdemeanor and gross misdemeanor convictions in a two-year period and asked the trial court to find an additional aggravating factor—that Reese's prior unscored misdemeanors would result in a presumptive sentence that was clearly too lenient. The trial court agreed and found this aggravating factor also present on all counts. The trial court similarly found two additional aggravating factors— deliberate cruelty and a high degree of sophistication or planning—on all counts.

Based on Reese's high offender score, multiple firearm enhancements, and four aggravating factors on each count, the State recommended an exceptional sentence of 1,200 months (100 years) of confinement for the felony murder count. Reese requested a standard-range sentence of 411 months for his felony murder conviction, plus an additional mandatory 312 months for his multiple firearm enhancements, for a total of 723 months of confinement for the felony murder count. Accepting the State's recommendations, the trial court imposed an exceptional sentence of 888 months of confinement for the felony murder, Count I, with the mandatory 60 additional months for the firearm enhancement. On the remaining counts, the trial

court added 340 months to the standard ranges and imposed exceptional sentences; it also imposed additional mandatory 60-month firearm enhancements on Counts I, II, IV, and VI, and additional mandatory 36-month firearm enhancements on Counts III and V. The trial court ran these enhancements consecutively to each count's underlying exceptional sentence; it then ran all these enhanced sentences concurrently. The trial court also found that each one of four aggravating factors was an "independent and sufficient basis" justifying Reese's exceptional sentences. Suppl. CP at 647.

Reese appeals his convictions and exceptional sentences.

## ANALYSIS

### I. CrR 3.6 SUPPRESSION MOTION

Reese first argues that the trial court (1) violated his Fourth Amendment[12] rights by admitting the statements he made to Pierce County police officers in the San Mateo County jail because the statements were tainted by his unlawful traffic stop; and (2) erred in denying his request for a CrR 3.6 evidentiary hearing to determine the admissibility of these statements. These arguments fail.

### A. Standard of Review

We review a trial court's CrR 3.6 conclusions of law de novo. *State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999).[13] When evaluating a CrR 3.6 motion, the trial court has discretion to take oral testimony; we review such decisions for abuse of discretion. *State v. Kipp*,

---

[12] U.S. CONST. amend. IV.

[13] *Abrogated on other grounds by Brendlin v. California*, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007).

171 Wn. App. 14, 28, 286 P.3d 68 (2012) (citing *State v. McLaughlin*, 74 Wn.2d 301, 303, 444 P.2d 699 (1968)), *review granted*, 176 Wn.2d 1024 (2013). A trial court abuses its discretion if its decision is manifestly unreasonable or rests on untenable grounds. *Kipp*, 171 Wn. App. at 28. We find no abuse of discretion here.

### B. Denial of Motion To Suppress

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. U.S. CONST. amend. IV; *State v. Williams*, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984). As a general rule, warrantless searches and seizures are per se unreasonable unless they fall within "a few '"jealously and carefully drawn" exceptions'" to the warrant requirement. *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999) (internal quotation marks omitted) (quoting *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996)). A traffic stop is a "'seizure'" under constitutional analysis. *Ladson*, 138 Wn.2d at 350 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d (1979)).

Under the Fourth Amendment, police officers may conduct a warrantless investigatory stop of a vehicle—to which traffic stops are analogous—if they possess reasonable suspicion that the person stopped has been or is about to be involved in a crime. *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000); *State v. Bonds*, 174 Wn. App. 553, 564-65, 299 P.3d 663 (2013). "Reasonable suspicion" requires "'specific, articulable facts' which, together with 'objective and reasonable' inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (quoting *United States v. Hernandez–Alvarado*, 891 F.2d 1414, 1416 (9th Cir.1989)). Evidence derived from an unlawful search or seizure, including inculpatory statements of the defendant,

may be suppressed under the fruit of the poisonous tree doctrine. *Wong Sun v. United States*, 371 U.S. 471, 485-86, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *State v. Gaines*, 154 Wn.2d 711, 716-717, 116 P.3d 993 (2005); *State v. Hilton*, 164 Wn. App. 81, 89, 261 P.3d 683, 272 P.3d 852, *review denied*, 173 Wn.2d 1037, *cert. denied*, 133 S. Ct. 349 (2012).

Reese fails to show that Officer Klier's traffic stop was unreasonable under the Fourth Amendment and that his (Reese's) subsequent statements in jail should have been suppressed. Under California law, a police officer may "stop a motorist . . . if the facts and circumstances known to the officer support at least reasonable suspicion that the driver has violated the Vehicle Code or some other law." *People v. Miranda*, 17 Cal. App. 4th 917, 926, 21 Cal. Rptr. 2d 785 (1993). Although an officer "need not perfectly understand the law when he stops [a] vehicle, his observation must give him an objective basis to believe that the vehicle violates the law." *Twilley*, 222 F.3d at 1096. Nevertheless, an officer's reliance on the wrong statute does not render his actions unlawful under the Fourth Amendment if there is a correct statute that applies to the defendant's conduct. *People v. Justin K.*, 98 Cal. App. 4th 695, 700, 120 Cal. Rptr. 2d 546 (2002) (citing *United States v. Wallace*, 213 F.3d 1216, 1221 (9th Cir. 2000)).

Reese unpersuasively argues that Klier's traffic stop was unlawful because he erroneously stated in his probable cause statement that Knight's failure to have a front license plate on her vehicle violated CVC section "5204," rather than section "5202," which governs license plate display requirements. Br. of Appellant at 30. As described above, Klier's subjective understanding of the statutory scheme is not dispositive of the legality of his actions; as long as Klier's conduct was objectively reasonable under existing law and there is a correct

statute that applies to the defendant's unlawful conduct, there is no Fourth Amendment violation. *Justin K.*, 98 Cal. App. 4th at 699-700. Such is the case here.

California Vehicle Code, section 5202, requires all vehicles driven on California state roads to comply with the licensing requirements of the state in which they are licensed. CVC § 5202; *People v. White*, 107 Cal. App. 4th 636, 643 n.8, 132 Cal. Rptr. 2d 371 (2003) (section 5202 incorporates out-of-state requirements into California law). At the time Klier conducted a traffic stop of Knight's vehicle, former RCW 46.16.230 (2010)[14] required the Washington State Department of Licensing to issue "two identical vehicle license number plates" for each vehicle; former RCW 46.16.240 (2010)[15] further provided that the "vehicle license number plates *shall be attached conspicuously at the front and rear of each vehicle* . . . and in such a manner that they can be plainly seen and read at all times." (Emphasis added).

It is undisputed that Klier stopped Knight's vehicle, at least in part, after he observed that her vehicle was lacking its front license plate, which conduct violated both California and Washington law. Under the facts here, it is immaterial that Klier wrote the wrong statute section in his probable cause statement. *Justin K.*, 98 Cal. App. 4th at 700. Because Knight's failure to have a front license plate on her vehicle actually violated Washington law, Klier had an "objective basis"[16] for forming reasonable suspicion that she had violated the law,[17] and he was

---

[14] Former RCW 46.16.230 (2010), *repealed by* LAWS OF 2010, ch. 161, § 438, effective July 1, 2011.

[15] Former RCW 46.16.240 (2010), *repealed by* LAWS OF 2010, ch. 161, § 438, effective July 1, 2011.

[16] *Twilley*, 222 F.3d at 1096.

16

justified in stopping her vehicle on this basis alone.[18] Because Klier's initial traffic stop was lawful under the Fourth Amendment based on Knight's failure to possess a front license plate, we hold that (1) there was no taint to any of the evidence obtained from this seizure, including Reese's later statements in jail; and (2) the trial court did not err in denying Reese's CrR 3.6 motion to suppress his statements.

### C. Denial of Evidentiary Hearing

Reese also argues that the trial court erred in denying his request for an evidentiary hearing because, in order to rule on his CrR 3.6 suppression motion, the trial court needed to take oral testimony from Klier to resolve factual issues about whether he had noticed that Reese was not wearing a seatbelt before or after turning on his emergency lights. We disagree.

CrR 3.6(a) provides:

> The court *shall determine whether an evidentiary hearing is required based upon the moving papers*. If the court determines that no evidentiary hearing is required, the court shall enter a written order setting forth its reasons.

---

[17] The facts here stand in marked contrast to those in *Twilley* and *White*, which Reese cites for support. In *Twilley* and *White*, California police officers stopped out-of-state vehicles after noticing that they lacked front license plates; but the officers erroneously believed that the vehicles' failure to possess front license plates violated the law in the vehicles' licensing states, which actually required only one license plate. *Twilley*, 222 F.3d at 1094; *White*, 107 Cal. App. 4th at 640. Under these circumstances, where the was no independent law that the drivers had violated by driving with only rear license plates, the Ninth Circuit Court of Appeals and the California State Court of Appeals both held that the traffic stops were unlawful under the Fourth Amendment and that the evidence obtained from these stops was inadmissible. *Twilley*, 222 F.3d at 1096; *White*, 107 Cal. App. 4th at 644-45.

[18] Because Klier's traffic stop was lawful based on Knight's failure to have a front license plate on her vehicle, as required by Washington law, we need not address whether Klier was also justified in stopping the vehicle based on his belief that Reese was not wearing a seatbelt.

(Emphasis added). Here, the trial court properly concluded that Klier's traffic stop was lawful based on Knight's failure to have a conspicuously displayed license plate on the front on her vehicle, which traffic infraction violated both California and Washington law. Because the trial court could rule that Klier's traffic stop was lawful on this basis alone, the trial court did not need to conduct an evidentiary hearing to resolve whether Klier also had an additional, independent basis for stopping Knight's vehicle based on Reese's failure to wear a seatbelt. Accordingly, we hold that the trial court did not abuse its discretion in denying Reese's request for an evidentiary hearing.

## II. EFFECTIVE ASSISTANCE OF COUNSEL

Reese next argues that he received ineffective assistance because his trial counsel advised him to waive his right to a jury trial, despite the same trial court judge's having already presided over two jury trials of Reese's codefendants, Knight and Higashi, which had resulted in convictions. This argument also fails.

### A. Standard of Review

To prove ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). The threshold for deficient performance is high: A defendant alleging ineffective assistance must overcome "'a strong presumption that

18

counsel's performance was reasonable."[19] If counsel's conduct "'can be characterized as legitimate trial strategy or tactics, performance is not deficient.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009)). To show prejudice, the defendant must establish that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Grier*, 171 Wn.2d at 34 (quoting *Kyllo*, 166 Wn.2d at 862). A defendant's failure to prove either prong ends our inquiry. *Hendrickson*, 129 Wn.2d at 78. Reese fails to meet his burden here.

## B. No Deficient Performance

Reese argues that his trial counsel's performance was deficient because "[a]ny competent counsel would have been able to foresee the risk . . . that the trial court . . . would consider evidence from the two prior trial[s] when 'deliberating'" on his case. Br. of Appellant at 51. Although this risk may have been present in Reese's bench trial, there is no evidence in the record that Reese and his trial counsel were unaware of this risk or that they had failed to discuss it when considering Reese's jury waiver. On the contrary, the record shows that Reese and his trial counsel had discussed the possibility of waiving a jury for "three weeks," that Reese was aware of "just about every possible pitfall" involved in his jury waiver, and that he was fully informed when he exercised his right to waive a jury. 1 VRP at 53.

The decision to forego a jury was also reasonable in light of the fact that codefendants Knight and Higashi had already been convicted by juries and that Reese's defense involved

---

[19] *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)), *adhered to in part on remand*, 168 Wn. App. 635, 278 P.3d 225 (2012).

sophisticated legal arguments about accomplice liability, which arguably would have been easier for the trial court to understand and, therefore, to accept. We defer to an attorney's strategic decisions to pursue, or to forego, particular lines of defense when those strategic decisions are reasonable given the totality of the circumstances. *Strickland*, 466 U.S. at 689-91; *Grier*, 171 Wn.2d at 33-34. Given the totality of circumstances, we hold that Reese fails to show deficient performance. Accordingly, his ineffective assistance of counsel claim fails on this ground alone and we need not address the prejudice prong of the applicable test.

### III. SUFFICIENCY OF EVIDENCE

Reese next argues that the State presented insufficient evidence to support his convictions for (1) first degree robbery of James and Charlene, Counts II and IV; (2) second degree assault of Charlene, Count V; and (3) first degree felony murder, Count I.[20] We disagree.

### A. Standard of Review

Evidence is sufficient to support a conviction if, "after viewing the evidence and all reasonable inferences from it in the light most favorable to the State, a rational trier of fact could find each element of the crime proven beyond a reasonable doubt." *State v. Homan*, 172 Wn. App. 488, 490-91, 290 P.3d 1041 (2012) (citing *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)), *review granted*, 177 Wn.2d 1022 (2013). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v.*

---

[20] Although Reese assigns error to the trial court's finding that he had committed second degree assault of JS, Count III, contrary to RAP 10.3(a)(6), he does not devote a separate section of his brief of appellant to discuss this claimed error. We do not consider claims of error unsupported by argument or citation to legal authority; therefore, we decline to consider this undeveloped argument. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

*Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "Circumstantial evidence and direct evidence are equally reliable." *State v. Moles*, 130 Wn. App. 461, 465, 123 P.3d 132 (2005) (citing *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980)). We "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (citing *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)).

Where, as here, the defendant is tried by the court sitting without a jury, our review is limited to determining whether substantial evidence supports the trial court's findings of fact and whether these findings support its conclusions of law. *State v. Stevenson*, 128 Wn. App. 179, 193, 114 P.3d 699 (2005). "'Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding.'" *State v. Solomon*, 114 Wn. App. 781, 789, 60 P.3d 1215 (2002) (quoting *Mendez*, 137 Wn.2d at 208.). We consider unchallenged findings of fact as verities on appeal. *Stevenson*, 128 Wn. App. at 193. We review conclusions of law de novo. *Id.*

### B. First Degree Robberies of James and Charlene

Reese argues that we should reverse his convictions for first degree robbery of James and Charlene, Counts II and IV, because there is insufficient evidence that he was an accomplice to these crimes. This argument fails.

A person is guilty of first degree robbery when (1) he "unlawfully takes personal property from the person of another or in [another's] presence, against his or her will by the use or threatened use of immediate force, violence, or fear of injury"; and (2) "[i]n the commission of [the] robbery or of immediate flight therefrom," he is "armed with a deadly weapon." RCW

9A.56.190[21]; RCW 9A.56.200(1)(a)(i). A defendant may be liable as an "accomplice" if, "[w]ith knowledge that it will promote or facilitate the commission of the crime," he either (1) "[s]olicits, commands, encourages, or requests [another] person to commit" the crime; or (2) "[a]ids or agrees to aid another person in planning or committing" the crime. RCW 9A.08.020(3)(a).[22] To be an accomplice, the defendant must act with knowledge that he is promoting or facilitating *the* specific crime charged, not simply "'a crime.'" *State v. Cronin*, 142 Wn.2d 568, 578-79, 14 P.3d 752 (2000) (quoting *State v. Roberts*, 142 Wn.2d 471, 512, 14 P.3d 713 (2000) (internal quotation marks omitted)).

To be culpable as an accomplice, (1) the defendant "need not participate in [the crime,] have specific knowledge of every element of the crime nor share the same mental state as the principal," *State v. Berube*, 150 Wn.2d 498, 511, 79 P.3d 1144 (2003) (citations omitted); but (2) he must be associated "'with the venture and participate in it as something he wishes to bring about and by his action make it succeed.'" *State v. Parker*, 60 Wn. App. 719, 725, 806 P.2d 1241 (1991) (quoting *State v. Jennings*, 35 Wn. App. 216, 220, 666 P.2d 381). Mere physical presence, even with knowledge of ongoing criminal activity, is insufficient to establish the requisite intent for finding the defendant culpable as an accomplice. *State v. Everybodytalksabout*, 145 Wn.2d 456, 472, 39 P.3d 294 (2002) (quoting *In re Welfare of Wilson*,

---

[21] The legislature amended RCW 9A.56.190 in 2011. LAWS OF 2011, ch. 336, § 379. The amendments added neutral gender language and did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

[22] The legislature amended RCW 9A.08.020 in 2011. LAWS OF 2011, ch. 336, § 351. The amendments added neutral gender language and did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

91 Wn.2d 487, 491-92, 588 P.2d 1161 (1979)). But presence at the scene of an ongoing crime, however, may be sufficient if the defendant is "'ready to assist.'" *In re Welfare of Wilson*, 91 Wn.2d at 491 (internal citation omitted); *see also Everybodytalksabout*, 145 Wn.2d at 472-73.

Reese correctly notes that James and Charlene were robbed of their wedding rings before he (Reese) even entered the house. Nevertheless, the State proved that Reese was an accomplice to these crimes by demonstrating that (1) he knew his actions would promote or facilitate these specific crimes, (2) he was present and ready to assist in some manner, and (3) he was not merely present at the scene with only some knowledge of potential criminal activity. *State v. Asaeli*, 150 Wn. App. 543, 568, 208 P.3d 1136, *review denied*, 167 Wn.2d 1001 (2009); RCW 9A.08.020(3). The trial court entered findings of fact and conclusions of law that Reese had committed first degree robbery of James and Charlene when one of his accomplices (1) "unlawfully took personal property (a wedding ring)" from each of their persons against their will; (2) Reese had intended to commit the robbery thefts; (3) both force and fear were used to obtain this property; and (4) Reese's accomplice, Higashi, was "armed with a firearm" during the commission of these robberies. Suppl. CP at 632, 633 (Findings of Fact (FF) V, VI).

Satisfying the statutory elements of first degree robbery, the trial court specifically found that (1) "shortly after Knight and Higashi entered the Sanders' residence,"[23] leaving Reese behind in Knight's vehicle, Higashi had pointed his gun at James and Charlene; (2) Higashi and Knight had both ordered James and Charlene to "get down"[24] on the kitchen floor, zip tied their hands behind their backs, and forcibly removed their wedding rings from their fingers; and (3)

---

[23] Suppl. CP at 632, 633 (FF V, VI).

Higashi's firearm was used to overcome any resistance that James and Charlene had to the theft of their wedding rings during these robberies. Substantial evidence supports the trial court's findings of fact. These findings of fact, in turn, support the trial court's conclusions of law that these acts constituted first degree robbery of James and Charlene.

Reese argues that the evidence was insufficient to support his accomplice liability because (1) the trial court made no specific findings about his accomplice liability, and (2) there was no evidence that he and his codefendants had planned to take any personal property directly from James's and Charlene's persons (as opposed to merely from their house). The record shows otherwise. In its findings of fact and conclusions of law, the trial court found that Reese, Knight, Higashi, and Berniard had agreed to do three things: (1) to "use a ruse to enter" James's and Charlene's house, (2) to "use force or the threat of force to steal the expensive ring that [James] had listed for sale on Craigslist," and (3) to "take *other expensive items* in the house." Suppl. CP at 630 (FF II) (emphasis added). We reasonably read this third finding to include the wedding rings taken from James's and Charlene's fingers.

The trial court also found that Reese had admitted "planning and committing" the robberies and that part of the plan had involved Reese's using a Bluetooth device to communicate with Knight during the robberies. Suppl. CP. at 637 (FF XII). These findings of fact are supported by substantial evidence, including Reese's own statement in jail that he and (1) his codefendants had intended to "rob" James and Charlene of "expensive" property, (2) he (Reese) had solicited Berniard to participate in the crimes, (3) their "plan was to . . . go inside the

---

[24] Suppl. CP at 632, 633 (FF V, VI).

24

house and take everything out," and (4) they had communicated with Knight during the robberies using "Bluetooth" devices. Ex. 136 at 3.

The trial court's findings of fact support its conclusion of law that Reese was an accomplice to first degree robberies of James and Charlene. These findings of fact demonstrate that Reese promoted or facilitated the robberies by helping to plan them and that he was present at the scene and "'ready to assist'" while the crimes were committed. *In re Welfare of Wilson*, 91 Wn.2d at 491 (internal citation omitted). We hold that the evidence is sufficient to support Reese's convictions for the first degree robberies of James and Charlene, Counts II and IV.

### C. Second Degree Assault of Charlene

Reese similarly argues that we should reverse his conviction for second degree assault of Charlene, Count V, because there is insufficient evidence that he was an accomplice to this crime perpetrated by Berniard. Again, we disagree.

The State charged Reese with second degree assault of Charlene under RCW 9A.36.021(1)(c), (e).[25] CP at 140. Under these provisions of the second degree assault statute, "[a] person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree:

[. . .]
(c) Assaults another with a deadly weapon; or
[. . .]
(e) With intent to commit a felony, assaults another."

---

[25] The legislature amended RCW 9A.36.021 in 2011. LAWS OF 2011, ch. 166, § 1. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

RCW 9A.36.021(1)(c), (e). Reese could also be culpable as an accomplice if he knowingly promoted or facilitated another person in committing the crime. RCW 9A.08.020(3)(a).

Because no statute defines the term "assault," Washington recognizes three common law definitions of "criminal assault," one of which is to put "another in apprehension of [bodily] harm whether or not the actor intends to inflict or is incapable of inflicting that harm." *State v. Aumick*, 126 Wn.2d 422, 426 n.12, 894 P.2d 1325 (1995) (quoting *State v. Walden*, 67 Wn. App. 891, 893-94, 841 P.2d 81 (1992)). The defendant or his accomplice must act with the specific intent to create apprehension of such harm. *State v. Byrd*, 125 Wn.2d 707, 713, 887 P.2d 396 (1995). A firearm is considered a deadly weapon. RCW 9A.04.110(6)[26]; *State v. Hartzell*, 156 Wn. App. 918, 945, 237 P.2d 928 (2010).

The trial court found that Reese had committed second degree assault of Charlene when (1) his accomplice, Berniard, "held a deadly weapon, a semiautomatic pistol, to Charlene Sanders' head and counted backward from 3 to 1 while threatening to kill her and her family"; and (2) this conduct caused Charlene to believe that she would be killed if she did not comply with Berniard's demand to reveal the safe's location.[27] Suppl. CP at 633 (FF VII). These findings of fact are supported by the following substantial evidence: Both Charlene and JS testified that Berniard had pointed a gun at the back of Charlene's head and had started counting

---

[26] The legislature amended RCW 9A.04.110 in 2011. LAWS OF 2011, ch. 336, § 350; ch. 166, § 2. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

[27] The trial court also found that Reese committed second degree assault when Berniard "intentionally kicked Charlene Sanders in the head which recklessly inflicted substantial bodily harm while repeatedly demanding the location . . . to the family safe." Suppl. CP at 633 (FF VII).

down from three; JS testified that the gun's hammer was "cocked"; and Charlene testified that when Berniard counted down to "[one]," she believed she was going to die. 2 VRP at 188; 3 VRP at 344. The trial court's findings of fact also support its conclusion of law that these actions constituted second degree assault of Charlene.

Reese argues that there was insufficient evidence to support his accomplice liability for Berniard's assault of Charlene because there was no evidence (1) that Reese and his codefendants had planned to use force or threat of force against anyone in the house except James; or (2) that Reese had promoted or facilitated the commission of the crime by "stay[ing] in the kitchen" after he walked CK and JS there. Br. of Appellant at 27. Contrary to Reese's argument, the trial court did not find that Reese and his codefendants had "intended to use force and threat of force *only* against Mr. Sanders." Br. of Appellant at 27 (emphasis added). As described more above, the trial court explicitly found that Reese and his codefendants had agreed (1) to "use a ruse to enter" James's and Charlene's house, (2) to "use force and the threat of force to steal the expensive ring that Mr. Sanders had listed for sale on Craigslist," and (3) to "take other expensive items in the house." Suppl. CP at 630 (FF II). Although this finding of fact does not specify the persons against whom Reese and his codefendants had intended to use force or the threat of force to steal the Craigslist ring, this finding can reasonably be understood as encompassing all residents in the house. This interpretation is supported by substantial evidence in the record, including that (1) Reese and his codefendants had each possessed zip ties and, thus, were capable of restraining multiple residents; and (2) Reese, Higashi, and Berniard had each possessed loaded firearms and were capable of using them.

27

The trial court also made findings involving Reese's accomplice culpability. In its findings of fact and conclusions of law, the trial court specifically found that Reese, Knight, Higashi, and Berniard had all planned and "agreed to commit . . . assault" and had "actively participated in [the] execution of their plans." Suppl. CP at 630 (FF II). The trial court further found that Reese had ordered CK and JS downstairs at gunpoint and that Reese had "positioned the children on the floor in such a location that the children could see and hear Berniard threaten to shoot . . . Charlene." Suppl. CP at 635 (FF X). These findings implicitly recognize that Reese had remained in the kitchen after he brought the children there and that he was present during Berniard's assault of Charlene to persuade her to divulge the location of the family's safe. Substantial evidence supports these findings.

The trial court's findings also support its conclusion of law that Reese was an accomplice to the assault of Charlene. The findings of fact show that Reese promoted or facilitated the assault because his actions during the crime can reasonably be interpreted as providing encouragement, and Reese was present and "ready to assist" during the commission of the crime. RCW 9A.08.020(3)(a); see also In re Welfare of Wilson, 91 Wn.2d at 491. We reiterate the trial court's findings that Reese had participated in the plan to invade the Sanders' home, armed with guns and zip ties, and to remove their valuables. We hold that the evidence was sufficient to support Reese's conviction for second degree assault of Charlene, Count V.

## D. Felony Murder

Reese also argues that we should reverse his first degree felony murder conviction, Count I, because there is insufficient evidence to support his conviction for first degree robbery of James, Count II, the predicate offense for the felony murder. As previously explained, there is

28

sufficient evidence to support Reese's conviction for first degree robbery of James. Thus, this argument also fails for the same reasons.

## IV. SAME CRIMINAL CONDUCT AND MERGER

Reese next argues that the trial court miscalculated his offender score because several of his current offenses constituted the same criminal conduct and/or merged for double jeopardy purposes. These arguments fail.

### A. Same Criminal Conduct

Reese contends on appeal the trial court should have concluded that the following groups of offenses constituted the same criminal conduct: (1) first degree burglary (Count VI), first degree robbery of Charlene (Count IV), and second degree assault of Charlene (Count V); (2) first degree burglary (Count VI) and first degree robbery of James (Count II); and (3) first degree burglary (Count VI) and second degree assault of JS (Count III). We disagree.

### 1. Standard of review

We review a trial court's determination of what constitutes the same criminal conduct for abuse of discretion or misapplication of the law. *State v. Mutch*, 171 Wn.2d 646, 653, 254 P.3d 803 (2011). The trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). We narrowly construe the same criminal conduct analysis to disallow most assertions of same criminal conduct. *State v. Porter*, 133 Wn.2d 177, 181, 942 P.2d 974 (1997); *State v. Wilson*, 136 Wn. App. 596, 613, 150 P.3d 144 (2007).

Generally, the trial court determines the sentencing range for each current offense by calculating the offender score based on all other current offenses and prior convictions. RCW

9.94A.589(1)(a); *State v. Vike*, 125 Wn.2d 407, 410, 885 P.2d 824 (1994). But if the trial court finds that all or some of the current offenses encompass "the same criminal conduct" under RCW 9.94A.589(1)(a), then those offenses count as one crime and one point for offender score purposes. RCW 9.94A.589(1)(a). The statute defines "same criminal conduct" as "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a). If any one of these elements is not met, the trial court must score each offense separately. *Porter*, 133 Wn.2d at 181.

2. First degree burglary, first degree robbery, and second degree assault of Charlene

Reese first argues that the trial court should have concluded that his crimes of first degree burglary (Count VI), first degree robbery of Charlene (Count IV), and second degree assault of Charlene (Count V) constituted the same criminal conduct because they involved the same criminal intent, were committed at the same time and place, and involved the same victim. We disagree.

First, the crimes did not involve the same criminal intent.[28] Our Supreme Court has recognized that the objective intent of first degree burglary is completed when a defendant "[breaks] into [a] residence [while] armed with a deadly weapon." *State v. Lessley*, 118 Wn.2d 773, 778, 827 P.2d 996 (1992) (stating the crimes the defendant objectively intended to commit involved the property damage caused by breaking in and the assault by brandishing a deadly weapon; that the defendant also intended to commit kidnapping was purely speculative).

---

[28] Criminal intent for two crimes is the same only "when the defendant's intent, viewed objectively, does not change from one crime to the next, such as when one crime furthers another." *State v. Davis*, 90 Wn. App. 776, 781-82, 954 P.2d 325 (1998) (citing *State v. Lessley*, 118 Wn.2d 773, 777, 827 P.2d 996 (1992)).

Similarly, here, Reese completed the objective intent of first degree burglary when he rushed into Charlene's home while armed with a firearm intending to steal property from within.

The robbery of Charlene's ring and subsequent assault of Charlene to coerce the location of the safe also involved different criminal intents. The State charged Reese with second degree assault, Count V, based on Berniard subsequently holding a gun to her head and counting down from three while threatening to kill her in an attempt to persuade her to divulge the location of the family safe. The record shows, and the trial court found, that Berniard did not assault Charlene in this manner until (1) *after* Reese and his accomplices had already used the Craigslist ring-purchase ruse to gain entry into Charlene's house to steal the Sanders' valuables, and (2) *after* they had robbed Charlene of her wedding ring at Higashi's gunpoint while zip tied. The record supports the trial court's finding that the criminal objective of the robbery of Charlene's ring was completed *before* the second degree assault of Charlene in connection with the safe. *See* Suppl. CP at 635 (FF IX). Because Berniard's later assault of Charlene did not further the already completed robbery of Charlene's wedding ring, the later assault did not encompass the same criminal intent. Therefore, the trial court did not err in concluding that Reese's second degree assault and first degree robbery of Charlene were not the same criminal conduct.

The trial court also did not err in concluding that Reese's burglary was not the same criminal conduct as his first degree robbery and second degree assault because the victims of these crimes were different. Washington courts have repeatedly held that two crimes cannot be considered the same criminal conduct if one crime involves multiple victims and the other crime involves only one victim. *See e.g., Lessley*, 118 Wn.2d at 779; *State v. Davis*, 90 Wn. App. 776, 782, 954 P.2d 325 (1998); *State v. Davison*, 56 Wn. App. 554, 558-60, 784 P.2d 1268, *review*

*denied*, 114 Wn.2d 1017 (1990). In *Lessley*, our Supreme Court recognized that the defendant's first degree burglary involved "multiple victims" because it victimized the entire family residing in the burgled house, whereas his kidnapping crime involved only a single victim. 118 Wn.2d at 779. Because more than one victim was involved in the burglary, the Supreme Court concluded that the burglary could not be the same criminal conduct as the kidnapping. *Id.*

Similarly, here, Reese's first degree burglary involved multiple victims (i.e., the entire Sanders' family); but his first degree robbery, Count IV, and his second degree assault, Count V, each involved only one victim: Charlene. Because the burglary and the robbery and assault of Charlene had different victims, the trial court did not err in concluding that Reese's first degree burglary was not the same criminal conduct as either his first degree robbery or his second degree assault of Charlene.

Furthermore, Reese's argument overlooks the trial court's discretion to impose separate punishments under the burglary antimerger statute, which provides: "Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor[e] as well as for the burglary, and may be prosecuted for each crime separately." RCW 9A.52.050. Our Supreme Court has held that this statute gives the trial judge discretion to punish burglary separately, even if the burglary and another crime encompass the same underlying criminal acts. *Lessley*, 118 Wn.2d at 781-82. Accordingly, the trial court acted within its discretion under the burglary antimerger statute when it imposed a sentence for Reese's first degree burglary in addition to his sentences for first degree robbery and second degree assault.

We hold that the trial court did not err in concluding that Reese's crimes of first degree burglary (Count VI), first degree robbery of Charlene (Count IV), and second degree assault of Charlene (Count V) were not the same criminal conduct for offender score purposes.

3. First degree burglary and first degree robbery of James

Reese next argues that the trial court should have concluded that his first degree burglary (Count VI) and his first degree robbery of James (Count II) constituted the same criminal conduct. Again, we disagree.

As previously described, Reese's first degree burglary involved multiple victims, but his first degree robbery of James, Count II, had only a single victim—James. Because these two crimes involved different victims, they did not encompass the same criminal conduct. *See Lessley*, 118 Wn.2d at 779. The trial court also had discretion under the burglary antimerger statute to punish the burglary separately, regardless of whether it constituted the same criminal conduct as another crime. RCW 9A.52.050; *Lessley*, 118 Wn.2d at 781-82. Accordingly, we hold that trial court did not err in concluding that Reese's first degree burglary and first degree robbery of James were not the same criminal conduct for offender score purposes.

4. First degree burglary and second degree assault of JS

Reese also argues that the trial court should have concluded that his first degree burglary (Count VI) and his second degree assault of JS (Count III) constituted the same criminal conduct. For the same reasons set forth above, we disagree.

The second degree assault charged in Count III was based on Berniard's pistol whipping JS; much like the assault on Charlene, this crime was committed after Reese's burglary was already accomplished. The assault, therefore, did not further the burglary, and it had a different

33

criminal intent. Furthermore, the burglary and the assault involved different victims; therefore, the crimes did not encompass the same criminal conduct. *See Lessley*, 118 Wn.2d at 779. The trial court also had discretion to punish Reese's burglary separately under the burglary antimerger statute. Therefore, we hold that the trial court did not err in concluding that Reese's first degree burglary and second degree assault of JS were not the same criminal conduct for offender score purposes.

### B. Merger/Double Jeopardy

Reese next argues that the trial court should have merged the following pairs of convictions: (1) first degree robbery of James and/or Charlene (Counts II and IV) and first degree felony murder (Count I); and (2) first degree robbery of Charlene (Count IV) and second degree assault of Charlene (Count V).[29] We disagree.

### 1. Standard of review

Whether the merger doctrine bars double punishment is a question of law, which we review de novo. *State v. Williams*, 131 Wn. App. 488, 498, 128 P.3d 98 (2006), *adhered to on remand*, 147 Wn. App. 479, 195 P.3d 578 (2008). The double jeopardy clauses of the United States and Washington Constitutions prohibit multiple punishments for the same offense. U.S.

---

[29] The heading in Reese's brief states that his convictions for first degree robbery and second degree assault of Charlene (Counts IV and V) merged and that these convictions also merged with his first degree burglary conviction (Count VI). But the text that follows discusses only merger of Reese's first degree robbery and second degree assault of Charlene (Counts IV and V), and merger of his first degree robbery of James and Charlene (Counts II and Count IV) and first degree felony murder (Count I) convictions. Therefore, we address only these merger arguments. We again note, however, that the trial court had discretion under the burglary antimerger statute to punish Reese's burglary separately, in addition to other crimes that might otherwise have constituted the same criminal conduct. RCW 9A.52.050; *Lessley*, 118 Wn.2d at 782.

CONST. amend. V; WASH. CONST. art. I, § 9; *State v. Parmelee*, 108 Wn. App. 702, 708, 710, 32 P.3d 1029 (2001). "Courts use the merger doctrine as a tool of statutory construction to determine [whether] the legislature intend[ed] multiple punishments to apply to particular offenses." *State v. Saunders*, 120 Wn. App. 800, 820, 86 P.3d 232 (2004).

Under the merger doctrine, when the degree of one offense is raised by conduct that the legislature has separately criminalized, we presume that the legislature intended to punish both offenses once through a greater sentence for the greater crime. *State v. Freeman*, 153 Wn.2d 765, 772-73, 108 P.3d 753 (2005). Two offenses merge under the merger doctrine if, "to prove a particular degree of crime (*e.g.*, first degree rape) the State must prove not only that a defendant committed that crime (*e.g.*, rape) but that the crime was accompanied by an act which is defined as a crime elsewhere in the criminal statutes (*e.g.*, assault or kidnapping).'" *Freeman*, 153 Wn.2d at 777-78 (quoting *State v. Vladovic*, 99 Wn.2d 413, 420-21, 662 P.2d 853 (1983)). In other words, where a predicate offense is an underlying element of another crime, generally the predicate offense will merge into the second, more serious crime and the court may not punish it separately. *Saunders*, 120 Wn. App. at 821; *Vladovic*, 99 Wn.2d at 421. A well-recognized exception exists, however, if the predicate offense is "a separate injury to 'the person or property of the victim or others, which is separate and distinct from and not merely incidental to the crime of which it forms an element.'" *Freeman*, 153 Wn.2d at 778-79 (quoting *State v. Frohs*, 83 Wn. App. 803, 807, 924 P.2d 384 (1996)).

2. First degree robbery of Charlene and first degree felony murder of James

Reese argues that the trial court should have concluded that his conviction for first degree robbery of James and/or Charlene (Counts II and IV, respectively) merged into his conviction for

first degree felony murder (Count I) because first degree robbery was the predicate offense for felony murder. The trial court found that Reese's first degree robbery of Charlene was the predicate felony that elevated the felony murder of James to the first degree.[30]

Reese was convicted of first degree felony murder, as defined in RCW 9A.32.030(1)(c). The elements of this statute expressly require an associated conviction for another crime:

(1) A person is guilty of murder in the first degree when:
[. . .]
(c) He or she commits or attempts to commit the crime of either (1) *robbery in the first or second degree*, (2) rape in the first or second degree, (3) burglary in the first degree, (4) arson in the first or second degree, or (5) kidnapping in the first or second degree, and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

RCW 9A.32.030(1)(c) (emphasis added). As charged by the State, the predicate offense for Reese's first degree felony murder charge was his commission of "[r]obbery in the first or second degree," not his commission of one of the other felonies listed in the felony murder statute. CP at 137. Thus, in order to find Reese guilty of first degree felony murder, the trial court had to find that Reese and/or one of his accomplices had committed (1) first or second degree robbery and (2) had caused James's death in the course of, in furtherance of, or in immediate flight from that robbery. RCW 9A.32.030(1)(c)(1).

The trial court found that Reese's first degree robbery of Charlene was the predicate felony that elevated the felony murder of James to the first degree:

JOSHUA NATHAN REESE is guilty beyond a reasonable doubt of the crime of Murder in the First Degree (Felony Murder, with the predicate being first degree robbery) as charged in Count I because on April 28, 2010, an accomplice, committed first degree robbery by robbing Charlene Sanders of her wedding ring;

---

[30] Therefore, we do not address Reese's merger argument with respect to the robbery of James.

the defendant's accomplice caused the death of James Sanders, Sr., in the course of or in furtherance of the robbery.

Suppl. CP at 638 (Conclusion of Law III). Where, as here, the robbery and the murder victims are two different people, there is no double jeopardy, not even when the robbery of one victim elevates the murder of the other victim to the first degree. *See e.g., In re Francis*, 170 Wn.2d 517, 531, 242 P.3d 866 (2010) (felony murder of one victim and the attempted robbery of a different victim were distinct, legally independent offenses for double jeopardy purposes; both convictions stand).

Accordingly, we hold that Reese's convictions for first degree robbery of Charlene's wedding ring (Count IV) and first degree felony murder of James (Count I) did not merge; nor did they constitute double jeopardy.

### 3. First degree robbery and second degree assault of Charlene

Reese also argues that the trial court should have concluded that his conviction for second degree assault of Charlene (Count V) merged with his conviction for first degree robbery of Charlene (Count IV). The State, again, responds that these convictions do not merge because (1) the first degree robbery of Charlene was completed when Reese and his accomplices took the wedding ring off her finger at gun point; and (2) thus, Berniard's later assault of Charlene, to persuade her to divulge the location of the safe, was a separate and distinct injury for purposes of merger. We conclude that Reese is incorrect—but not for the reasons that the State argues. Instead, we focus on the trial court's express findings of two distinct incidents underlying these two separate crimes, such that the merger doctrine does not apply.

"The merger doctrine is relevant *only* when a crime is *elevated to a higher degree by proof of another crime proscribed elsewhere in the criminal code.*"[31] *Parmelee*, 108 Wn. App. at 710 (emphasis added). Here, the State charged Reese with first degree robbery of Charlene under RCW 9A.56.200(1)(a)(i), which allows the State to elevate a robbery to the first degree if the defendant (or his accomplice) is "armed with a deadly weapon" in the commission of a robbery or in immediate flight therefrom.[32] The trial court specifically found Reese guilty of robbery in the first degree of Charlene based on his accomplices' (Higashi and Knight) threatening Charlene with a firearm while removing Charlene's wedding ring. The trial court also found Reese guilty of a separate later crime, second degree assault of Charlene, based on his accomplice Berniard's later kicking her in the head, inflicting substantial bodily harm, pointing a gun at her head, and counting backwards while threatening to kill her and her family, while demanding the location and combination to the family safe. We hold that the trial court did not err in concluding that Reese's convictions for first degree robbery of Charlene and second degree assault of Charlene did not merge.

---

[31] For example, when a second degree assault (such as striking a victim) is the conduct that elevates a robbery to the first degree, there is "no evidence that the legislature intended to punish second degree assault separately from first degree robbery when the assault facilitates the robbery." *Freeman*, 153 Wn.2d at 776. Such second degree assault committed in furtherance of a robbery merges with the robbery unless a merger exception applies. *Id.* at 778. Such is not the case here.

[32] We note that the State did *not* allege that the robbery of Charlene's ring was elevated to the first degree by the infliction of bodily injury, an alternative under RCW 9A.56.200(1)(a)(iii).

## V. Sentencing

Last, Reese argues that we should vacate his exceptional sentences and grant him a new sentencing hearing because (1) the trial court miscalculated the standard-range sentences for his current convictions when it failed to merge convictions and, thus, calculated an offender score that was too high; (2) the trial court relied on this miscalculation when imposing his exceptional sentences; and (3) the exceptional sentences were too long. These arguments also fail.

### A. Offender Score

Contrary to Reese's argument, the trial court's refusal to merge convictions did not cause it to miscalculate his offender score. We have just held that Reese's challenged convictions did not merge; therefore, his offender score challenge on this ground fails.

### B. Exceptional Sentences

#### 1. Standard of review

A court may impose an exceptional sentence above the standard range if it finds "'substantial and compelling reasons'" for doing so and those reasons support the purposes behind the Sentencing Reform Act. *State v. Davis*, 146 Wn. App. 714, 719, 192 P.3d 29 (2008) (quoting former RCW 9.94A.535 (2008)), *review denied*, 166 Wn.2d 1033 (2009). We review exceptional sentences under a three-part test considering: (1) whether the reasons for departure are supported by the record under a clearly erroneous standard, (2) whether those reasons justify the departure as a matter of law, and (3) whether the exceptional sentence imposed was clearly too excessive or lenient under an abuse of discretion standard of review. *State v. Allert*, 117 Wn.2d 156, 163, 815 P.2d 752 (1991); RCW 9.94A.585(4). We find no basis for reversing Reese's exceptional sentences.

## 2. Aggravating factors

The trial court articulated four aggravating factors to support imposing exceptional sentences: (1) Reese's conduct manifested deliberate cruelty toward his victims, (2) his crimes involved a high degree of sophistication or planning, (3) his prior unscored misdemeanors would result in a presumptive sentence that is clearly too lenient, and (4) his multiple current offenses and high offender score would result in some of his current offenses going unpunished. Reese challenges only the first three reasons that the trial court gave for his exceptional sentence, but he does not challenge the fourth.

"[N]ot every aggravating factor must be valid to uphold an exceptional sentence, so long as [the reviewing] court is satisfied that the trial court would have imposed the same sentence based on the factors that are upheld."[33] Here, the trial court expressly found, "*Each* aggravating factor is an *independent and sufficient basis* for the exceptional sentence in this case." Suppl. CP at 647 (FF XVII) (emphasis added). Because the trial court explicitly stated it would impose the same exceptional sentence based on any one of the four articulated aggravating factors standing alone, we need hold only one of the trial court's reasons valid in order to affirm Reese's exceptional sentence. And because Reese does not challenge the fourth aggravating factor, this

---

[33] *State v. Ermels*, 156 Wn.2d 528, 539, 131 P.3d 299 (2006) (citing *State v. Hughes*, 154 Wn.2d 118, 134, 110 P.3d 192 (2005), *overruled on other grounds by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)); *see also State v. Jackson*, 150 Wn.2d 251, 276, 76 P.3d 217 (2003).

factor alone supports Reese's exceptional sentences, and we need not further address it[34] or the other three factors.

We hold that the trial court did not err in relying on this fourth unchallenged factor to justify its exceptional sentences. And because the record clearly supports that the trial court would have based Reese's exceptional sentences on this fourth factor alone, we affirm them.

### 3. Not clearly excessive

Reese also argues that we should reverse his exceptional sentences because the length (1,200 months, 100 years) is "clearly excessive." Br. of Appellant at 39. We disagree.

"Once proper grounds for an exceptional sentence are established, the length of the sentence is reviewed for an abuse of discretion." *State v. Burkins*, 94 Wn. App. 677, 701, 973 P.2d 15, *review denied*, 138 Wn.2d 1014 (1999) (citing *State v. Oxborrow*, 106 Wn.2d 525, 530, 723 P.2d 1123 (1986)). "Reviewing courts have 'near plenary discretion to affirm the length of an exceptional sentence, just as the trial court has all but unbridled discretion in setting the length of the sentence.'" *Burkins*, 94 Wn. App. at 701 (emphasis omitted) (quoting *State v. Bedker*, 74 Wn. App. 87, 101-02, 871 P.2d 673, *review denied*, 125 Wn.2d 1004 (1994)). "When no improper reasons are involved, a 'sentence is excessive only if its length, in light of the record, "shocks the conscience."'" *Burkins*, 94 Wn. App. at 701 (*State v. Vaughn*, 83 Wn. App. 669,

---

[34] Nevertheless, we note that RCW 9.94A.535(2)(c) authorizes the trial court to impose an exceptional sentence whenever "[t]he defendant has committed multiple current offenses and the defendant's high offender score results in some of the current offenses going unpunished." At the time of sentencing, Reese's offender score was 13, well over 9 points, the highest score possible under the sentencing grid; if the trial court had imposed standard range sentences, more than one of Reese's current offenses would have gone unpunished. This statutory reason for imposing an exceptional sentence is supported by the record and justifies departure from the standard range as a matter of law.

681, 924 P.2d 27 (1996) (citations omitted)). Reese fails to show that his sentences' lengths shock the conscience or were clearly excessive under this deferential standard.[35] Accordingly, we hold that the trial court did not abuse its discretion by imposing exceptional sentences.

We affirm Reese's convictions and exceptional sentences.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, P.J.

We concur:

Penoyar, J.

Bjorgen, J.

---

[35] *See, e.g., State v. Branch*, 129 Wn.2d 635, 650, 919 P.2d 1228 (1996) (upheld 48-month sentence for first degree theft, 16 times standard range of 90 days); *Oxborrow*, 106 Wn.2d at 535-36 (upheld 10-year sentence for first degree theft, 10 times standard range); *Bedker*, 74 Wn. App. at 92 (180-month sentence for child rape, compared to standard range of 72-96 months, not clearly excessive); and *State v. Harmon*, 50 Wn. App. 755, 760, 750 P.2d 664 (upheld 648-month sentence for first degree murder, 315 months longer than standard range), *review denied*, 110 Wn.2d 1033 (1988).